FERRARA & DiMERCURIO,
INC., Plaintiff, Appellee,

v.

ST. PAUL MERCURY INSURANCE
CO., Defendant, Appellant.

Ferrara & DiMercurio, Inc.,
Plaintiff, Appellant,

v.

St. Paul Mercury Insurance Co.,
Defendant, Appellee.

Nos. 98–1094, 98–1095.

United States Court of Appeals,
First Circuit.

Heard Oct. 8, 1998.

March 4, 1999.

setts. Ferrara & DiMercurio, Inc. ("F & D"), the owner of the vessel, sought to recover insurance under a Hull policy issued by St. Paul Mercury Insurance Company ("St. Paul"). St. Paul refused to pay, on the alternative grounds that either a third party had burned the vessel, an event that, in St. Paul's view, was expressly excluded from policy coverage, or else F & D had committed fraud by intentionally burning its own vessel. F & D brought this action in the district court, under the diversity jurisdiction, claiming that St. Paul's refusal to pay was a breach of the insurance contract and constituted "bad faith" in violation of Massachusetts consumer protection laws (Mass. Gen. Laws ch. 93A). Prior to trial, the district court ruled that the Hull policy covered losses caused by fires intentionally set by third parties. After St. Paul presented its arson-by-the-insured defense at trial, the district court granted judgment as a matter of law for F & D. The Chapter 93A claim was subsequently dismissed on summary judgment.

On appeal, St. Paul contends that the district court erred in ruling that losses caused by fires intentionally set by third parties are covered under the Hull policy. St. Paul also appeals from the district court's grant of F & D's motion for judgment as a matter of law. F & D cross-appeals from the district court's grant of St. Paul's motion for summary judgment on F & D's Chapter 93A claim.[1] For the reasons that follow, we reverse the district court's ruling that the Hull policy covers losses caused by third-party arson and reverse the directed verdict granted in favor of F & D. We affirm the dismissal of the Chapter 93A claim.

Richard H. Pettingell, with whom Davis, White & Pettingell, LLC, Anthony R. Zelle and Zelle & Larson were on brief for St. Paul Mercury Insurance Co.

Joseph M. Orlando, with whom David S. Smith, Vita A. Palazzolo and Orlando and Associates, were on brief for Ferrara & DiMercurio, Inc.

Before SELYA, Circuit Judge, COFFIN and CAMPBELL, Senior Circuit Judges.

LEVIN H. CAMPBELL, Senior Circuit Judge.

The commercial fishing vessel F/V TWO FRIENDS was destroyed by fire on July 3, 1993, while berthed in Gloucester, Massachu-

## I. BACKGROUND[2]

F & D was a closely-held, family corporation engaged in the commercial fishing trade. The corporation had four officers: Leonardo

---

1. F & D also challenges the district court's damages award on the breach of contract claim. As we reverse the directed verdict in favor of F & D, we do not address F & D's assignments of error with regard to the damages award.

2. As this case comes to us from a directed verdict against St. Paul on the breach of contract claim and summary judgment against F & D on the Chapter 93A cause of action, we state the facts as to the breach of contract claim in the light most favorable to St. Paul, while the facts relating to the Chapter 93A claim are stated in the light most favorable to F & D. *See Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 155–56 (1st Cir. 1998).

Ferrara, Sr., Vito Ferrara, Ambrose Ferrara, and Francesco DiMercurio. Six individuals, all family members, owned shares in the company: Leonardo Ferrara, Sr., Vito Ferrara, Ambrose Ferrara, Francesco DiMercurio, Vincenza Ferrara, and Enza DiMercurio.

In 1987, F & D purchased the commercial fishing vessel F/V TWO FRIENDS for $375,000 with the proceeds of a loan from the Gloucester Bank & Trust Company. As a condition of the loan, members of the Ferrara family agreed to act as personal guarantors of F & D's note. In addition, Vincenza Ferrara and Francesco DiMercurio pledged their homes as additional security. The TWO FRIENDS was the sole physical asset owned by F & D. It was insured for $350,000 under a Marine Hull and Machinery policy issued to F & D in 1992 by St. Paul. The Hull policy that was issued by St. Paul was an American Institute AHAB Form policy, revised as of July 1, 1962. The TWO FRIENDS was also insured for $350,000 under a War Risk policy issued to F & D by Underwriters at Lloyd's, London.[3]

At trial,[4] James Carey, St. Paul's accounting and financial expert, testified that F & D had operated at a loss from the moment of its formation. Carey testified that F & D had considerable difficulty in making timely loan payments to Gloucester Bank & Trust Company. Because F & D was habitually late in making its payments, the bank made demand in July, 1991, for payment in full of the outstanding loan, an amount in excess of $290,000. In November 1991, the bank made demand upon the personal guarantors of F & D's note for payment in full of the outstanding loan. Also in November 1991, the bank filed a lawsuit to foreclose on the residence of Vincenza Ferrara. After a period of negotiation, the bank, F & D, and the personal guarantors reached an agreement in January 1992, whereby the bank would forebear from proceeding to judgment in the foreclosure action so long as $15,000 was paid to the

bank and monthly payments were kept current thereafter.

After the January 1992 agreement, Carey testified that F & D continued to have difficulty making timely payments to the bank. At a meeting in April 1993, F & D and representatives of Gloucester Bank & Trust Company agreed that F & D would attempt to sell the TWO FRIENDS for $225,000. On April 15, 1993, F & D entered into an exclusive brokerage agreement with Ahern Marine Agency, Inc. in an effort to sell the TWO FRIENDS.

On July 2, 1993, the TWO FRIENDS returned to Gloucester from a five-day fishing trip with Leo Ferrara, Jr. and three crew members aboard. Leo Ferrara, Jr., the ship's engineer, testified that he left the TWO FRIENDS at approximately 4:30 p.m., and that he was the last crew member to leave the vessel. He further testified that prior to leaving the vessel, he had locked all of the doors both upstairs and downstairs. He testified that the only way to gain access to the TWO FRIENDS once these doors were locked was through the door on the crew quarters level, which he had secured with a padlock.

On July 3, 1993, at approximately 2:30 a.m., the TWO FRIENDS caught fire while tied to her berth at the Frontiero Brothers, Inc. wharf. When the Gloucester Fire Department arrived, firefighters discovered that the only door through which they could gain entry to the TWO FRIENDS was located on the crew quarters level and was padlocked. The firefighters cut the padlock in order to enter. The Gloucester Fire Department's preliminary report, which was prepared on July 4, 1993, indicated that the cause of the fire was electrical in nature, but the origin uncertain.

Leo Ferrara, Jr. and Vito Ferrara both testified that at the time of the fire, there were only four keys to the padlock used to secure the door on the crew quarters level.

---

3. Underwriters at Lloyd's, London is not a party to this action and F & D did not pursue recovery from Lloyd's in the district court under the War Risk policy.

4. F & D initiated suit against St. Paul in 1994. A mistrial was declared in a first trial when the jury could not agree to a verdict. A second jury trial was held from March 31 to April 11, 1997. That trial and accompanying proceedings form the basis of the present appeals.

One of the keys was in the possession of Leonardo Ferrara, Sr., the president of F & D, one was in the possession of his son, Vito Ferrara, the vice-president of the corporation, one was in the possession of Leo Ferrara, Jr., and the final key was hanging, along with the keys to other vessels, inside a warehouse on the Frontiero Brothers, Inc. wharf. Pasquale Frontiero, the owner of the wharf, testified that on the night of the fire he had locked the warehouse prior to going home for the evening. He testified that a few days after the fire, he noticed that the key to the TWO FRIENDS was still hanging in its usual location inside the warehouse.

After receiving notification of the fire aboard the TWO FRIENDS, St. Paul retained Fred O'Donnell, a fire scene analyst, and John Malcolm, a forensic electrical fire consultant, to investigate the cause and origin of the fire. O'Donnell and Malcolm first visited the fire scene on July 8, 1993. They were accompanied by David DuBois, a marine surveyor who had also been retained by St. Paul. On this initial visit, Malcolm, DuBois, and O'Donnell conducted a visual inspection of the TWO FRIENDS and O'Donnell took samples from the crew quarters and galley areas to determine whether an accelerant was present.

Malcolm and O'Donnell returned to the vessel on August 3, 1993, to obtain the electrical panels, ostensibly for inspection and possible subrogation claims. At the request of counsel for St. Paul, but without obtaining authorization from F & D, O'Donnell and Malcolm removed the electrical panels from the TWO FRIENDS. The panels were placed in an evidence storage locker at Malcolm's laboratory and were provided to counsel for F & D upon his request. O'Donnell testified that based upon his examination of burn patterns, he was able to identify points of origin for at least three, and possibly four, separate fires aboard the TWO FRIENDS. He testified that one point of origin was located adjacent to a bunk in the port side crew quarters bunkroom, and another point of origin was located one deck below the crew quarters in the engine room at an electrical panel on the forward starboard side bulkhead. O'Donnell testified that a third point of origin was also located in the engine room, on the port side next to the main hydraulic tank. Finally, O'Donnell testified that there was an area of "heavy burn" in the galley area.

O'Donnell testified that two of the three samples he had taken from the crew's quarters contained traces of diesel fuel, but that none of the samples taken from the galley area contained evidence of an accelerant. He further testified that, in his opinion, the fire on the port side of the engine room was set by someone placing a container filled with accelerant in the forward port corner of the engine room next to the hydraulic tank hoses.

Malcolm investigated the vessel's electrical system to determine whether it played any part in the fire. He testified that based upon his interview of Leo Ferrara, Jr. on July 8, 1993, it did not appear that the TWO FRIENDS had experienced any electrical difficulties on the July 2, 1993 fishing trip. Malcolm testified that he found no evidence that the electrical system had played any role in the fires in the bunkroom or in the fire that originated in the engine room on the port side. He testified, however, that he did find evidence of the escape of electricity, or "arcing," in the electrical panel on the forward starboard side bulkhead in the engine room. Malcolm testified that, based upon his examination of the vessel's electrical system, it was his opinion that the fire in the electrical panel in the engine room was the first fire to ignite on July 3, 1993. Malcolm also concluded in his written report, drafted on July 22, 1993, and testified at trial that the burn patterns in the area of the electrical panel were consistent with an accidental electrical fire. He specifically noted in his report and testified that it was possible for persons to intentionally set up the burning of an electrical panel to make the fire appear accidental, but that he had discovered no electrical evidence that this had occurred.

O'Donnell and Malcolm both testified that there was no evidence of "communication," or connection, between either of the two fires in the engine room and the fires in the crew quarters or between the two fires in the engine room. Based upon the arcing in the

engine room electrical panel and the absence of arcing elsewhere in the ship's electrical system, Malcolm concluded that the fire in the crew quarters could not have ignited the fire in the electrical panel in the engine room. Malcolm and O'Donnell both concluded that the fire at the electrical panel was not the source of the fire in the crew quarters, as there was no evidence that the electrical panel fire had spread upward from the panel. Based upon his examination of the burn patterns on the engine room floor boards, O'Donnell concluded that the fire in the electrical panel on the starboard side of the engine room did not cause the fire on the port side of the engine room next to the hydraulic tank.[5] Given the absence of evidence of communication among the various fires originating at different locations on the vessel, as well as the evidence that an accelerant was present in the crew quarters and on the port side of the engine room, O'Donnell testified that, in his opinion, the fires aboard the TWO FRIENDS had been deliberately set by someone.

Carey, the accounting expert, testified that at the time of the fire, F & D owed a total of $426,000 to various creditors. He further testified that to meet its financial obligations at the time of the fire, F & D would have had to generate revenues from its fishing operation of approximately $380,000 per year. Carey testified that F & D had never been that profitable in all its years of operation. Carey also testified that had the July 3, 1993 fire aboard the TWO FRIENDS resulted in a total loss of the vessel, and had St. Paul paid the full proceeds of the Hull policy, F & D would have gained $350,000 to be applied to its debts. Carey stated that as a loss payee under the policy, the Gloucester Bank

& Trust Company would have had its note paid in full, and that this payment would have extinguished the personal liability of the guarantors of the note and avoided the loss of the personal guarantors' homes. By contrast, Carey testified that had the vessel been sold for $225,000, the bank loans would not have been paid in full, the personal liability of the guarantors would not have been extinguished, and the homes of the personal guarantors would have remained in jeopardy.

Before trial, St. Paul requested a ruling of law that losses caused by arson committed by a party other than the insured were not covered under the Hull policy. The "Perils" clause of the Hull policy under which the TWO FRIENDS was insured listed "Fire" as a covered peril.[6] St. Paul argued, however, that only fires that are "fortuitous" and "of the Sea" are covered under the Perils clause, and that the fire in this case met neither requirement. St. Paul argued, in the alternative, that the Strikes, Riots, and Civil Commotions("SR & CC") clause excluded arson by third parties from coverage under the Hull policy. The SR & CC clause stated: "Warranted free of loss, damage or expense in consequence of strikes, lockouts, political or labor disturbances, civil commotion, riots, martial law, military or usurped power *or malicious acts.*" (emphasis supplied). The district court ruled that all fires, with the exception of those intentionally set by the insured, were insured under the Perils clause. The court further ruled that although arson by a third party was a "malicious act," the SR & CC clause did not exclude from coverage losses caused by fires intentionally set by third parties *unless* the arson was somehow "connected with" a strike, lockout, political or labor disturbance,

---

5. O'Donnell testified that the fire on the port side of the engine room and the fire at the engine room electrical panel were approximately 6–7 feet apart. He testified that the fire that originated at the electrical panel was "short-lived," while the fire on the floor in the engine room was "very hot, localized and intense."

6. The "Perils" clause states, in part:
Touching the Adventures and Perils which we, the said Underwriters, are contented to bear and take upon us, they are of the Seas, Men-of-War, *Fire*, Lightning, Earthquake, Enemies, Pirates, Rovers, Assailing Thieves, Jettisons, Letters of Mart and Counter–Mart, Surprisals, Takings at Sea, Arrests, Restraints and Detainments of all Kings, Princes and Peoples, of what nation, condition or quality soever, Barratry of the Masters and Mariners and of all other like Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment or Damage of the said Vessel, etc., or any part thereof; excepting, however, such of the foregoing Perils as may be excluded by provisions elsewhere in the Policy or by endorsement . . . . (emphasis supplied).

riot, or some other event set forth in the SR & CC clause. As the arson alleged by St. Paul did not fit within any of these categories, the district court ruled that the Hull policy provided coverage for losses caused as a result of the burning of the TWO FRIENDS by a third party.

Denied the opportunity to defend on the further ground that the vessel had been intentionally burned by unknown third parties, St. Paul concentrated at trial on the defense of arson-by-the-insured. In order to prevail on this defense, Massachusetts law required that St. Paul prove, by a preponderance of the evidence, that (1) the fire was incendiary in nature; (2) F & D had a motive to set the fire; and (3) F & D or its agents had an opportunity to set the fire. *See infra.* St. Paul presented the evidence recounted above, including its experts' opinions that multiple fires were deliberately set aboard the TWO FRIENDS, the evidence concerning the financial difficulties encountered by F & D prior to the fire, and the limited availability of keys to the locked vessel.

After St. Paul presented its arson defense,[7] F & D moved for judgment as a matter of law. The district court denied the motion and ruled that whether St. Paul had proved its arson defense was "a question for the jury." However, shortly after F & D had begun to put on its rebuttal case, the district court reconsidered its prior ruling and directed a verdict in favor of F & D. While the court considered it "a very close question," it concluded that the circumstantial evidence presented by St. Paul was not sufficient to allow a jury to return a verdict in its favor.[8]

Thereafter, the court allowed the parties to undertake additional discovery on F & D's claim that St. Paul's refusal to settle under the Hull policy constituted an unfair or deceptive business practice under Mass. Gen. Laws ch. 93A. During this additional discov-

ery period, St. Paul produced, for the first time, a report that had been prepared by its marine surveyor, David DuBois, on July 9, 1993, in which DuBois concurred with the preliminary conclusion of the Gloucester Fire Department that the fire on July 3, 1993, was electrical in nature. The parties filed cross-motions for summary judgment on F & D's Chapter 93A claim. The district court granted summary judgment in favor of St. Paul.

## II. ANALYSIS

The parties have filed cross-appeals challenging the rulings of the district court. For the reasons that follow, we conclude that the district court erred in ruling that losses caused by fires intentionally set by third parties were not excluded by the SR & CC clause from coverage under the Hull policy. We reverse the directed verdict granted in favor of F & D on the breach of contract claim, but affirm the district court's grant of summary judgment in favor of St. Paul on the Chapter 93A claim.

### A. Arson By Third Parties

We review *de novo* the district court's interpretation of the St. Paul Hull insurance policy. *See St. Paul Fire and Marine Ins. Co. v. Warwick Dyeing Corp.,* 26 F.3d 1195, 1199 (1st Cir.1994). We are guided by several familiar rules of construction.[9] In examining the language of the policy, we consider "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Trustees of Tufts Univ. v. Commercial Union Ins. Co.,* 415 Mass. 844, 849, 616 N.E.2d 68 (1993) (quoting *Hazen Paper Co. v. United States Fidelity & Guaranty Co.,* 407 Mass. 689, 700, 555 N.E.2d 576 (1990)). Absent ambiguity, we give policy language its plain and ordinary meaning. *See Cody v. Connecticut Gen. Life Ins. Co.,* 387 Mass.

---

7. F & D's case, which consisted, in essence, of the fact that St. Paul had issued the Hull policy and a fire had occurred on July 3, 1993, was presented to the jury in the form of a stipulation entered into by the parties.

8. The reasoning of the district court is described in greater detail in Part II.B., *infra.*

9. Although neither party addressed the issue, we shall assume that since the policy was delivered to F & D in Massachusetts, which is also the domicile of F & D and a state in which St. Paul is authorized to do business, the substantive law of Massachusetts applies. *See United States Aviation Underwriters, Inc. v. Fitchburg-Leominster Flying Club, Inc.,* 42 F.3d 84, 86 (1st Cir.1994).

142, 146, 439 N.E.2d 234 (1982). Any ambiguity is resolved against the insurer, who drafted the policy, and in favor of the insured. Thus, "if there are two rational interpretations of policy language, the insured is entitled to the benefit of the one that is more favorable to it." *Hazen,* 407 Mass. at 700, 555 N.E.2d 576. The insured bears the burden of proving that a claim falls within the grant of coverage, which, once established, shifts the burden to the insurer to show the applicability of any exclusion. *Camp Dresser & McKee, Inc. v. Home Ins. Co.,* 30 Mass.App.Ct. 318, 321, 568 N.E.2d 631 (1991).

 St. Paul asserts that the fire aboard the TWO FRIENDS, if deliberately set by a third party, was not covered under the Perils clause of the Hull policy because it was not "of the seas" or "fortuitous." *See* G. Gilmore & C. Black, *The Law of Admiralty,* § 2–9, p. 72 (2d ed.1975) (perils "of the sea" are "fortuitous losses occurring through extraordinary action of the elements at sea, or any accident or mishap in navigation"). St. Paul misreads the Perils clause. *See* n. 6, *supra.* "Fire" is specified as a covered peril in itself, separate and apart from the perils "of the sea." *See Rosa v. Insurance Co. of the State of Pennsylvania,* 421 F.2d 390, 392 (9th Cir. 1970) (interpreting nearly identical perils clause to provide coverage for electrical fire).[10] St. Paul's interpretation of the Perils clause would result in a denial of coverage even if the fire aboard the TWO FRIENDS were found to be entirely accidental in nature, since the fire would not have resulted from the elements at sea or navigational accident, and, thus, would not be "of the

seas." That is not a rational construction of the Perils clause. Indeed, St. Paul consistently disavowed such an interpretation below, contending instead that coverage was not available under the Hull policy because the loss had been caused by the *intentional* burning of the vessel.

 St. Paul's focus on the Perils clause is misplaced, as F & D carried its burden of proving that accidental fires fall within the grant of coverage under the Perils clause. The burden shifted to St. Paul to demonstrate that a fire set deliberately by a third party was, as the Perils clause states, "excluded by provisions elsewhere in the Policy or by endorsement." St. Paul asserts that the SR & CC clause, which excludes from coverage "loss, damage or expense in consequence of strikes, lockouts, political or labor disturbances, civil commotion, riots, martial law, military or usurped power or malicious acts," excludes losses caused by third-party arson. The district court, however, construed the SR & CC clause narrowly as excluding only losses caused by malicious acts that are performed *within the context of* "strikes, lockouts, political or labor disturbances, civil commotion, riots, martial law, military or usurped power."

F & D concedes that arson by a third party constitutes a "malicious act." F & D urges us, however, to affirm the district court's constricted reading of the SR & CC clause. Like the district court, we have found little guidance in the case law as to the proper construction of the language at issue.[11] The parties rely primarily upon the decision of the district court in *O'Donnell–*

---

10. Even if fortuity were a requirement for fire coverage, arson by a third party, however intentional on the part of the arsonist, surely is "fortuitous" vis-a-vis the insured, who does not expect that such a loss will occur. It is the expectation of the *parties,* particularly the insured, that determines the fortuitousness of a loss. *See* 1 Arthur E. Brunck *et al.,* Ocean Marine Insurance, Ch. 5, at 157 (1988) (fortuitous cause of loss is one that assured does not expect or intend).

11. The SR & CC clause is a standard exclusionary provision in many types of insurance policies. Courts have, on occasion, construed certain of the specific exclusions set forth in the clause. *See, e.g., Pan American·World Airways,*

*Inc. v. Aetna Casualty & Surety Co.,* 505 F.2d 989, 1019–1022 (1974) (construing "riot" and "civil commotion"); *Luckett–Wake Tobacco Co. v. Globe & Rutgers Fire Ins. Co.,* 171 F. 147, 148 (W.D.Ky.1908) (construing "riot"). The particular language utilized by St. Paul, however, deviates from the language these courts construed in that it appends the phrase "or malicious acts" to the other exclusions typically found in an SR & CC clause. No decision construing the "malicious acts" language found in the 1962 AHAB Form policy used by St. Paul to insure the TWO FRIENDS has been brought to our attention; only the *Bathurst* opinion discussed above deals with fairly similar language.

*Usen Fisheries v. Bathurst,* 664 F.Supp. 37 (D.Mass.1987). In *Bathurst,* the F/V Ann C. Spencer was destroyed by fire. A party unrelated to the insured was charged with arson of the vessel, but later acquitted. The insurer argued that arson by a third party was not covered by the insurance policy. The district court examined in some detail the interplay between marine Hull policies, such as the one at issue here, and War Risk policies. The latter, as the court pointed out, provide coverage for those risks precluded from coverage under Hull clauses.[12] In *Bathurst,* the insured, unlike F & D, did not have a Hull policy. Nevertheless, the district court read the applicable War Risk policy to provide coverage for only those risks that a Hull policy *would have* covered but for the preclusion from coverage under its War, Strikes and Related Exclusions ("WSRE") clause. The court utilized the WSRE clause from the 1970 version of the American Institute Hull Clauses ("AIHC") form, which excluded from coverage any losses caused by, *inter alia,* "malicious acts or vandalism."[13] The insured conceded that arson was a "malicious act or vandalism." Thus, the court concluded that "when malicious acts or vandalism occur in the form of arson the loss is precluded from coverage by the [WRSE clause]." *Id.* at 41. Since the WRSE clause of the Hull policy excluded coverage for losses caused by arson perpetrated by a third party, the court held that the War Risk policy provided coverage for such losses. *See id.* at 42.

St. Paul argues that *Bathurst* supports its claim that arson by a third party is excluded under the SR & CC clause, while F & D

asserts that *Bathurst* is distinguishable, as the court was interpreting a different insurance form than was used to insure the TWO FRIENDS. The district court agreed with F & D and distinguished *Bathurst* on the ground that the SR & CC clause in the St. Paul policy was "narrower" than the WRSE clause construed by the court in *Bathurst.*

We see no important distinction, however, between the language used in the 1962 AHAB Form used by St. Paul and the 1970 AIHC Form construed by the district court in *Bathurst.* The language used in the two policy forms is nearly identical. Both clauses exclude coverage for losses caused by, *inter alia,* "malicious acts," and both list "malicious acts" after a succession of others of different generic types. We are, of course, not bound by *Bathurst.* However, we believe that the *Bathurst* court's interpretation of "malicious acts or vandalism" in the WRSE clause, without any contextual limitation of the type found by the district court here, was sound.

By contrast, we do not believe that the district court's instant construction of the SR & CC clause was correct. "Malicious acts" is set forth in the SR & CC clause as a separate, unmodified exclusion from coverage. To be sure, it appears in a clause labeled, "Strikes, Riots, and Civil Commotions," and is preceded by other events certain of which fit generically under that label. But nothing in the plain language and grammar of the clause supports the district court's constriction of excludable "malicious acts" to only those acts perpetrated within the context of one or more of the other co-listed events. Nor, in our view, would an objectively rea-

---

12. As the court explained, Hull clauses and War Risk clauses "dovetail so that together they provide total coverage, without overlap, for all the perils listed in the Hull Clauses." 664 F.Supp. at 40.

13. The "War, Strikes and Related Exclusions" clause of the 1970 AIHC Form provided, in part: This policy does not cover any loss, damage or expense caused by, resulting from, or incurred as a consequence of:
 (a) Capture, seizure, arrest, restraint or detainment, or any attempt threat; or
 (b) Any taking of the Vessel, by requisition or otherwise, whether in time of peace or war and whether lawful or otherwise; or

 (c) Any mine, bomb or torpedo not carried as cargo on board the Vessel; or
 (d) Any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter; or
 (e) Civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or piracy; or
 (f) *Strikes, lockouts, political or labor disturbances, civil commotions, riots, martial law, military or usurped power, malicious acts or vandalism* ...
(emphasis supplied)

sonable insured interpret the "malicious acts" exclusion so narrowly. Like the insured in *Bathurst*, F & D concedes, as it must, that arson by a third party is a "malicious act." Accordingly, losses caused by third-party arson are excluded under the SR & CC clause.[14]

We add that restricting "malicious acts" to only those malicious acts that also fall under the previously-listed generic categories of strikes, lockouts, political or labor disturbances, etc. would render the "malicious acts" language superfluous. For this reason, it would be inappropriate to apply the *ejusdem generis* canon of construction, under which general words following specific ones are sometimes limited to the formers' objects. The Supreme Court has said that the *ejusdem generis* canon "cannot be employed to render general words meaningless." *United States v. Alpers*, 338 U.S. 680, 682, 70 S.Ct. 352, 94 L.Ed. 457 (1950). In the SR & CC clause, losses "in consequence of strikes, lockouts, political or labor disturbances, civil commotion, riots, martial law, military or usurped power" are already excluded from policy coverage. That exclusion obviously applies to malicious as well as to other acts within the described generic categories. Hence to limit the phrase, "malicious acts," to just those activities related to the former categories would be to render the "malicious acts" provision redundant, an interpretation running counter to the customary assumption that all the words within a clause serve some purpose. *Compare Reiter v. Sonotone Corp.*,

442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used."); *see also* 2A J. Sutherland, Statutes and Statutory Construction § 46.06. Only by reading "malicious acts" as including malicious actions beyond those associated with the earlier categories does the phraseology add in a meaningful fashion to what has already been said.

■ Here, the malicious acts in question are arson—and not, as a practical matter, arson by the owner or its agents, which are actions separately excluded from coverage by law, but the rarer acts of fire-setting by vandals or other malicious individuals. Such acts fall within the general category of intentional third-party violence which can be said to be a principal overall theme of the SR & CC clause. The "malicious acts" category serves the relevant purpose of excluding destructive acts "not public or tumultuous enough to be considered a riot or civil commotion." Harry L. Haehl, Jr., The Hull Policy: Coverages and Exclusions Frequently Employed: F.C. & S., War Risk, S.R. & C.C., Automatic Termination, Cancellation, 41 Tulane L.Rev. 277, 286 (1967).[15] In sum, the SR & CC clause unambiguously excludes from coverage losses caused by "malicious acts," including arson, whether or not the malicious acts occur in the context of one or more of the other events listed in the SR & CC clause.[16] Thus, on remand, the jury

---

**14.** The most recent AIHC Form makes explicit that losses caused by malicious acts and acts of vandalism, in whatever context, are excluded from coverage under a Hull policy. The 1977 revision to the War, Strikes and Related Exclusions clause in the AIHC Form sets forth, as a *separate* exclusion, "malicious acts or vandalism." As one commentator has noted, the revision confirms that the clause "exclude[s] from the marine coverage all damage which is intentionally done." Leslie J. Buglass, Marine Insurance and General Average in the United States (4th ed.1994), at p. 59.

**15.** We recognize that the title of the SR & CC clause, "Strikes, Riots & Civil Commotions," may seem to suggest a narrower focus for that clause than is accorded by our reading of the "malicious acts" provision. But to the extent there is a difference between the title and the plain language of the clause, the latter prevails.

*See Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 118 S.Ct. 1952, 1956, 141 L.Ed.2d 215 (1998) (title of statute cannot limit or control meaning of text). The practical need for brevity in a title may result, as here, in a less than perfect match-up. Here, for example, the title likewise makes no reference to "martial law, military or usurped power" nor to "lockouts." We don't believe that the title wags the dog.

**16.** While scholarly commentary interpreting the SR & CC language does not focus on the question before us, neither does it support the district court's narrow construction of the SR & CC clause. *See* Harry L. Haehl, Jr., The Hull Policy: Coverages and Exclusions Frequently Employed: F.C. & S., War Risk, S.R. & C.C., Automatic Termination, Cancellation, 41 Tulane L.Rev. 277, 286 (1967) ("The reference to persons acting maliciously brings in situations where the act is not public or tumultuous enough to be consid-

should be permitted to determine whether the fire on July 3, 1993 was deliberately set by third parties. Should the jury answer that question in the affirmative, St. Paul would not be liable under the Hull policy.[17]

### B. St. Paul's Arson Defense

At trial, St. Paul proceeded on the theory that F & D had committed insurance fraud by deliberately burning the TWO FRIENDS. Shortly after F & D began to present its rebuttal case, the district court ruled from the bench that St. Paul had failed to adduce sufficient evidence of arson by the insured to reach the jury. Accordingly, although the district court considered it "a very close question,"[18] it granted F & D's motion for judgment as a matter of law on the breach of contract claim.

We review de novo the district court's grant of F & D's motion for judgment as a matter of law, viewing the evidence in the light most favorable to St. Paul. See Brennan v. GTE Government Sys., 150 F.3d 21, 25 (1st Cir.1998). In order to present its arson defense to a jury, St. Paul must provide "more than a scintilla of evidence and may not rely on conjecture or speculation." Katz v. City Metal Co., 87 F.3d 26, 28 (1st Cir.1996). However, the court "must not consider the credibility of the witnesses, resolve the conflicts in testimony, or evaluate the weight of the evidence." Andrade v. Jamestown Housing Auth., 82 F.3d 1179, 1186 (1st Cir.1996). "A verdict may be directed only if, applying these standards, the evidence does not permit a reasonable jury to find in favor of [St. Paul]." Brennan, 150 F.3d at 26.

St. Paul bore the burden of demonstrating at trial that servants or agents of F & D deliberately set the fire aboard the TWO FRIENDS. More specifically, Massachusetts law requires that a party interposing an arson-by-the-insured defense prove the following elements by a preponderance of the evidence: (1) that the fire was incendiary (deliberately set); (2) that opportunity existed for servants or agents of the insured to set the fire; and (3) that the insured had a motive to set the fire. See, e.g., Osvaldo Varane, Inc. v. Liberty Mutual Insurance Co., 362 Mass. 864, 865, 284 N.E.2d 923 (1972).

The district court ruled that St. Paul had failed to carry its burden as to each of the above elements and, thus, could not reach the jury on its arson-by-the-insured defense. With regard to motive, the district court concluded that since the benefit of the insurance proceeds would have gone to Gloucester Bank & Trust Company and F & D's creditors in the first instance, F & D had no economic motive to burn the TWO FRIENDS. Indeed, the court concluded that F & D had strong reason not to burn the TWO FRIENDS. The court stated: "Where was the advantage to the corporation or to the individuals of the family who owned it, in the destruction of their means of livelihood?"

With regard to opportunity, the court noted that the last agent of F & D to be near the TWO FRIENDS was Leo Ferrara, Jr., who left the vessel approximately 11 hours before the fire started. The court concluded that since St. Paul's witnesses could not place any agent or servant of F & D near the TWO FRIENDS closer in time to the fire, the evidence of opportunity was too weak to go to the jury.

Finally, the district court rejected as untenable St. Paul's theory of incendiarism. The court noted that both Malcolm and O'Donnell had testified that the fire located

---

ered a riot or civil commotion."); Victor A. Dover, Analysis of Policy Forms and Clauses (1960), at p. 60 ("It would not appear to be material that such fire or other peril be brought into operation by the deliberate acts, incendiary or otherwise of strikers, etc.").

**17.** As noted supra, the TWO FRIENDS was also insured under a War Risk policy issued by Underwriters at Lloyd's, London. The district court based its ruling that losses caused by third-party

arson are covered solely upon its construction of the Hull policy. We take no position as to the coverage afforded losses caused by third-party arson under the War Risk policy, as the parties did not litigate that issue below and do not raise it on appeal.

**18.** The district court denied F & D's motion for judgment twice—once after opening arguments and again at the close of St. Paul's evidence on the arson defense.

at the electrical panel in the engine room had ignited first. Even assuming that the electrical panel fire had been deliberately set, the court concluded that it "simply does not make sense" that a person would set that fire and then proceed, at considerable danger to his own safety, to ignite fires in other areas of the boat. Indeed, the court described this as an "odd way to burn a boat." The "bottom line on liability," in the court's view, was that St. Paul's incendiarism theory required some evidence that the fire had been prearranged or planned. As St. Paul did not present such evidence, the court concluded that it was "too big a leap" for a reasonable jury to find that F & D had deliberately burned the TWO FRIENDS.

We do not disagree with the district court that the arson-by-the-insured defense gives rise to close and difficult factual questions. Nevertheless, after careful review of the entire record, we conclude that the district court erred in withdrawing the arson defense from the jury and directing a verdict in favor of F & D. St. Paul presented sufficient circumstantial evidence as to each of the required elements of its arson defense to reach the jury. The circumstantial evidence of motive was strong. While it is true that the Ferrara family would not have pocketed the proceeds of the St. Paul policy directly, Carey testified that a complete loss of the TWO FRIENDS would have resulted in a payment of $350,000, a substantial portion of which would have gone to extinguish the debt to the Gloucester Bank & Trust Company. Carey also testified that this payment would have saved the personal guarantors' homes, which had been pledged as additional security to the bank. Further, there was substantial evidence from which a reasonable jury could conclude that F & D had never been a profitable venture, and, given its considerable debt obligations, was in dire straits financially at

the time of the fire. This was sufficient evidence of motive to reach the jury. *See Osvaldo,* 362 Mass. at 865, 284 N.E.2d 923 (insured's business experiencing financial difficulties, payments to mortgagees in arrears, accounts payable far exceeded accounts receivable, and home had suffered foreclosure).

■■■ The evidence with regard to opportunity was somewhat weaker. The court found it significant that no servant or agent of F & D had been seen near the TWO FRIENDS at or near the time of the fire. Such direct evidence is not required to present an arson defense to the jury.[19] There was undisputed testimony that there were only four keys to the TWO FRIENDS, three of which were in the possession of agents of F & D, the other being in the possession of the wharf owner. The evidence that access to the vessel was limited and that the Gloucester Fire Department had to force entry when it arrived on the scene may have led the jury, if permitted to consider it, to find that the arsonist had a key. *See Richardson v. Travelers' Fire Ins. Co.,* 288 Mass. 391, 396, 193 N.E. 40 (1934) (evidence warranted finding that insured alone had key which would permit person to enter house and leave it locked up as it was when firemen arrived); *see also Gregory's Continental Coiffures & Boutique, Inc. v. St. Paul Fire & Marine Ins. Co.,* 536 F.2d 1187, 1191 (7th Cir.1976) (reversing directed verdict for insured where evidence that access to premises was limited could have resulted in jury determination that insured had procured someone to start fire and had given individual a key).

■■■ As said, the "bottom line" to the district court on liability was its concern that the jury would have to speculate or unreasonably "leap" in order to accept St. Paul's incendiarism theory. It is true that if one fully accepts the testimony of Malcolm and

---

**19.** It is true that in criminal arson cases, Massachusetts courts have sometimes found significant the absence of evidence that the defendant was on the premises at or near the time of the fire. *See, e.g., Commonwealth v. Cardenuto,* 406 Mass. 450, 456, 548 N.E.2d 864 (1990) (holding circumstantial evidence insufficient to sustain guilty verdict where there was no evidence placing defendant at scene of fire, no evidence of an agreement to set fire, and no evidence that defendant had made false or misleading statements relative to investigation). These cases do not impose a requirement that there be eyewitness testimony placing defendant at the scene. Lack of such evidence, however, is treated by the courts as one factor in determining whether the government has proved defendant's guilt beyond a reasonable doubt. St. Paul, of course, need only prove its arson defense by a preponderance of the evidence.

O'Donnell that the fire at the electrical panel in the engine room ignited first, the timing of the fires appears somewhat "odd." We do not believe, however, that this was sufficient reason to withdraw the arson defense from the jury. The jury, not the judge, is the fact-finder. The incendiarism element of an arson defense does not require that the insurer prove the arsonist chose the most logical or safest method for setting a fire, or that the fire was carefully planned or pre-arranged by members of the corporation.[20]

It does not matter that the trial judge drew a different inference or conclusion from the evidence presented or "[felt] that other results [were] more reasonable." *Boston & M.R.R. v. Cabana*, 148 F.2d 150, 152 (1st Cir.1945). It was for the jury to weigh the testimony of Malcolm and O'Donnell and all the other evidence in order to determine whether the fire aboard the TWO FRIENDS was deliberately set. Malcolm and O'Donnell both testified that at least three, and possibly four, separate fires had been set, and that there was no evidence of "communication" between them. O'Donnell testified that some of the samples taken from the vessel showed traces of diesel fuel and that, in his opinion, the fire located on the port side of the engine room had been set by someone placing a container filled with accelerant in the forward port corner of the engine room next to the hydraulic tank hoses. We cannot say that a jury presented with this evidence lacked sufficient basis from which to conclude that multiple fires were deliberately set aboard the TWO FRIENDS.

The district court stated that it was aware of no case "where the evidence of fraud is, or

arson, is as thin and slender as it is in this case." However, the evidence of arson presented by St. Paul was similar in both substance and character to other evidence found sufficient under Massachusetts case law to sustain an arson defense. *See Osvaldo*, 362 Mass. at 864–65, 284 N.E.2d 923 (expert evidence indicated presence of accelerant, insured's business experiencing financial difficulties, and insured seen near premises approximately one hour prior to fire); *see also Richardson*, 288 Mass. at 396–97, 193 N.E. 40 (fire incendiary in origin, doors and windows locked when firemen arrived, and insured was "in need of money"), *cf. Demoranville v. Star Ins. Co. of America*, 319 Mass. 214, 215, 65 N.E.2d 315 (1946) (finding of·arson not warranted where no evidence that property burned was a bad investment, some of the windows could be opened from outside, and no evidence to show how the fire started). As in *Osvaldo* and *Richardson*, the evidence in this case was circumstantial in nature. Inferences can, of course, properly be drawn from circumstantial evidence. Each case necessarily turns on its own facts, and evidence of opportunity, for example, may be stronger in one case than in another. The question is whether, viewing all of the evidence in the light most favorable to St. Paul and giving it the benefit of every legitimate inference, reasonable jurors nonetheless could have come to but one conclusion, a conclusion adverse to St. Paul. We conclude that reasonable jurors could determine that F & D deliberately set fire to the TWO FRIENDS in order to fraudulently obtain the proceeds of the insurance policy. There-

20. The district court noted that there was no evidence that F & D "authorized" anyone to burn the TWO FRIENDS. *See Mississippi Lofts, Inc. v. Lexington Ins. Co.*, 841 F.2d 251, 253 (8th Cir.1988) (holding that arson may not be attributed to a corporation unless the perpetrator acted with the corporation's assent). As said, to sustain its arson defense, St. Paul must prove that an agent or servant of F & D burned the vessel. "Corporate assent to arson may be proved by circumstantial evidence, and the scope of admissible relevant evidence is necessarily broad." *Id. See also Cora Pub, Inc. v. Continental Casualty Co.*, 619 F.2d 482, 486 (5th Cir. 1980) (proof of corporate assent "is not likely to

be found in the archives of the corporation"). The jury is entitled to consider the fact that F & D was a closely-held corporation controlled by only a few family members. *See Mississippi Lofts*, 841 F.2d at 253 ("Several courts have permitted a jury to find from circumstantial evidence that an arsonist acted at the request or with the assent of an insured corporation, especially where the corporation is closely-held and where principal officers or stockholders are implicated in the act."). Thus, we do not believe that the lack of direct corporate "assent" precludes St. Paul from presenting its arson defense to the jury.

fore, we reverse the directed verdict in favor of F & D.[21]

### C. Violation of Massachusetts Unfair Practices Statute

 The district court granted St. Paul's motion for summary judgment on F & D's claim, brought pursuant to Mass. Gen. Laws chs. 93A and 176D, that St. Paul refused to settle the claim under the Hull policy in bad faith. We review the district court's grant of summary judgment *de novo* and view all facts in the light most favorable to F & D, drawing all reasonable inferences in its favor. *See Aponte Matos v. Toledo Davila,* 135 F.3d 182, 186 (1st Cir.1998).

 It is an unfair settlement practice, and also an unfair or deceptive act or practice under Mass. Gen. Laws. ch. 93A,[22] if an insurance company fails "to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." Mass. Gen. Laws ch. 176D, § 3(9)(f). *See Equitable Life Assurance Soc'y of the United States v. Porter-Englehart,* 867 F.2d 79, 88 (1st Cir.1989) (those injured by insurance practices proscribed by chapter 176D may sue under chapter 93A). Section 3 of chapter 176D lists eleven unfair claim settlement practices, including "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information." Mass. Gen. Laws. ch. 176D, § 3(9)(d). F & D does not assert that St. Paul failed to conduct a reasonable investigation before denying its claim, but rather bases its unfair practices claim solely upon St. Paul's failure to pay under the Hull policy when, after its investigation was completed, liability under the policy was "reasonably clear."

F & D has failed to point to sufficient evidence supporting its unfair practices claim to avoid summary judgment. St. Paul's refusal to settle the claim was based, in part, upon the expert opinions of Malcolm and O'Donnell, who concluded that the fires aboard the TWO FRIENDS had been deliberately set. We have concluded that those opinions, along with the other evidence supporting St. Paul's arson-by-the-insured defense, entitle St. Paul to present the liability issue to the jury. Under these circumstances, it cannot be said that liability is "reasonably clear," even at this stage of the proceedings.[23] Insurers are both encouraged and entitled to rely, as St. Paul did here, on the advice of expert consultants in evaluating liability. *See Van Dyke v. St. Paul Fire & Marine Ins. Co.,* 388 Mass. 671, 677–78, 448 N.E.2d 357 (1983) (affirming summary judgment in favor of insurer on claim of failure to settle where information provided by defense counsel and expert witness established that liability was not reasonably clear); *see also Demeo v. State Farm Mut. Auto. Ins. Co.,* 38 Mass.App.Ct. 955, 957, 649 N.E.2d 803 (1995) (liability not reasonably clear where objective inquiry into applicable facts and law indicated 50% possibility that driver other than insured would be found sole cause of accident by jury).

21. We have said that, in doubtful cases, allowing the case to go to the jury rather than granting a motion for judgment as a matter of law "is often a wise and time-saving precaution." *Talbot–Windsor Corp. v. Miller,* 309 F.2d 68, 69 (1st Cir.1962). *See also* 9A Wright & Miller, *Federal Practice and Procedure: Civil 2d* § 2533, p. 319 (1995) ("appellate courts repeatedly have said that it usually is desirable to take a verdict, and then pass on the sufficiency of the evidence on a post-verdict motion"). The district court did not follow that procedure here, as it thought that there was a danger that the Ferraras would be "labeled" arsonists by what it believed would be an untenable jury verdict, and that the perception of the Gloucester community would not be altered by the "band-aid" of a judgment n.o.v.

22. Chapter 93A, § 11, provides, in part:

Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice ... may, as hereinafter provided, bring an action in the superior court. . . .

23. Nor did St. Paul act in bad faith in interpreting the Hull policy to exclude coverage for losses caused by arson committed by a third party. *See Gulezian v. Lincoln Ins. Co.,* 399 Mass. 606, 613, 506 N.E.2d 123 (1987) (insurance company that denies claim for coverage on the basis of a plausible interpretation of its insurance policy cannot be said to have committed a violation of chapter 93A).

F & D attempts to bolster its unfair practices claim by asserting that Malcolm's taking possession of the electrical panels without obtaining F & D's permission and the belated production, after trial, of the DuBois report, in which DuBois concurred with the preliminary conclusion of the Gloucester Fire Department that the cause of the fire aboard the TWO FRIENDS was electrical in nature, constituted "unfair or deceptive act[s] or practice[s]" under chapter 93A.

The unauthorized removal of the electrical panels and the failure to produce the DuBois report, while disturbing, fail to save F & D's Chapter 93A claim. In order to make out a claim under chapters 93A and 176D, a claimant "must establish *both* that an unfair trade practice occurred *and* that the unfair practice resulted in a loss to the claimant." *Alan Corp. v. Int'l Surplus Lines Ins. Co.*, 22 F.3d 339, 343 (1st Cir.1994) (italics in original). There was no evidence that St. Paul removed the electrical panels from the TWO FRIENDS for any improper purpose, or that the delay in returning them to F & D caused any harm whatsoever to F & D. Thus, F & D has failed to demonstrate that it suffered any loss as a result of this conduct.[24]

Respecting the late production of the DuBois report, this—as the district court stated—might more accurately be described as a possible abuse of the discovery process than an unfair or deceptive "business practice." In any event, F & D has not shown a causal link between the late production of the DuBois report, which was created prior to the completion of the investigation by Malcolm and O'Donnell, and St. Paul's refusal to settle under the Hull policy, the alleged loss to F & D, which was based upon the later opinions of Malcolm and O'Donnell.

We *affirm* the district court's grant of summary judgment in favor of St. Paul on the chapter 93A claim. We *reverse* the court's ruling that losses caused by arson committed by a third party are covered under the Hull policy, and *reverse* the directed verdict in favor of F & D on the breach of

contract claim. The judgment on the breach of contract claim is vacated and the cause remanded for further proceedings consistent with this opinion. Each side shall bear its own costs on these appeals.

*So ordered.*

---

**24.** The district court concluded that F & D had failed to demonstrate any loss from the taking of the electrical panels because it prevailed on its motion for judgment as a matter of law. Our conclusion that there was no loss from this conduct rests on the different ground that the evidence failed to demonstrate that F & D was harmed by the taking of the electrical panels.