**Lillian D. CURTIN, Plaintiff**

v.

**UNUM LIFE INSURANCE COMPANY OF AMERICA and UNUMPROVI-DENT CORPORATION, Defendants.**

No. 03–CV–110–P–S.

United States District Court,
D. Maine.

Jan. 12, 2004.

Jon Holder, Holder & Grover, Patricia A. Peard, Bernstein, Shur, Sawyer, & Nelson, Ronald W. Schneider, Jr., Bernstein, Shur, Sawyer, & Nelson, Portland, for Lillian D Curtin, Unum Life Insurance Company of America, Unumprovident Corporation.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT, MOTION FOR CONTINUANCE, AND MOTIONS TO STRIKE

SINGAL, Chief District J.

Plaintiff Lillian Curtin brings this suit against Unum Life Insurance Company of America and UnumProvident Corporation (together "Defendants" or "Unum") under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), alleging that Defendants have unlawfully withheld benefits to which she is entitled under an accidental death and dismemberment policy. Presently before the Court

are: Plaintiff's Motion for Summary Judgment (Docket # 8), Defendants' Cross–Motion for Summary Judgment (Docket # 15), Defendants' Motion for Continuance Pursuant to Federal Rule of Civil Procedure 56(f) (Docket # 17), and Defendants' motions to strike based on Plaintiff's noncompliance with Local Rule 56 (Docket # 23) and Local Rule 7(e) (Docket # 29). For the reasons set forth below, Plaintiff's Motion for Summary Judgment is GRANTED, Defendants' Cross–Motion for Summary Judgment is DENIED, Defendants' Motion for Continuance Pursuant to Federal Rule of Civil Procedure 56(f) is declared MOOT, Defendant's "Motion to Strike Plaintiff's Responses to Unum Life's Opposing Statement of Material Facts and Plaintiff's Responses to the Defendants' Statement of Additional Facts" is GRANTED, and "Defendants' Motion to Strike Pleading Entitled 'Plaintiff's Objection to Defendants' Motion to Strike and to the Introduction of New Issues'" is declared MOOT.

## I. Motions to Strike

Before addressing the merits of the motions for summary judgment, the Court must resolve the motions to strike filed in connection with the statements of material fact required by Local Rule 56. A flurry of filings followed the summary judgment motions now before the Court, largely due to Plaintiff's counsel's complete disregard of the local rules of this Court, and his apparent inability to present legal arguments in a proper manner. The exchange began typically enough: Plaintiff filed a Statement of Material Facts (Docket # 9) and Unum Life Insurance Company of America filed a response to Plaintiff's Statement of Material Facts and a Statement of Additional Material Facts (Docket # 16).[1] Plaintiff then filed a document titled "Plaintiff's Response to Defendants' Answers to Plaintiff's Statement of Material Facts and to Defendants' Own Statement of Material Facts" (Docket # 21), which was followed by Defendants' "Motion to Strike Plaintiff's Responses to Unum Life's Opposing Statement of Material Facts and Plaintiff's Responses to the Defendants' Statement of Additional Facts" (Docket # 23), to which Plaintiff responded with a document titled "Plaintiff's Objection to Defendants' Motion to Strike and to the Introduction of New Issues" (Docket # 27). Defendants responded with "Defendants' Reply to Plaintiff's Objection to Defendant's Motion to Strike and to Introduction of New Issues" (Docket # 28) and "Defendants' Motion to Strike Pleading Entitled 'Plaintiff's Objection to Defendants' Motion to Strike and to the Introduction of New Issues'" (Docket # 29),[2] which was followed by a letter from Plaintiff's counsel to the Clerk of this Court (Docket # 31), finally recognizing that the exchange of motions "appears to be getting ridiculous" and stating that he "consider[s] it unnecessary to file any further arguments."

---

1. Two later filings explain in a footnote that Defendants' counsel considered Plaintiff's motion for summary judgment to be a motion for summary judgment against Defendant Unum Life Insurance Company of America only. While Plaintiff's motion for summary judgment is by no means artfully crafted, the Court finds no basis to conclude that the motion seeks summary judgment against only one of the Defendants. Because Defendants are represented by the same counsel and have otherwise shared legal documents, the Court will treat documents filed by Unum Life Insurance Company of America in response to Plaintiff's motion for summary judgment as filed on behalf of both Defendants.

2. Both of these documents were signed by Defendants' attorneys as "Attorneys for City of Portland, ME". This apparent error is disregarded by the Court.

The parties' arguments and their resolution are as follows. Defendants have moved to strike Plaintiff's responses to Defendants' answers to Plaintiff's Statement of Material Fact on the grounds that these additional responses are not allowed under Local Rule 56 (Docket # 23). Local Rule 56(d) requires that a reply statement of material facts "shall be limited to any additional facts submitted by the opposing party." D. Me. Loc. R. 56(d). Thus, Defendants are correct that Local Rule 56 does not allow Plaintiff to submit responses to Defendants' responses to Plaintiff's statement of material facts. Accordingly, Plaintiff's responses to Defendants' answers to Plaintiff's statements of material fact (contained in Docket # 21) are STRICKEN, and the portion of Defendants' motion to strike that addresses Plaintiff's response to Defendant's response to Plaintiff's statement of material facts is GRANTED.

Defendants also argue in Docket # 23 that thirty-four of Plaintiff's responses to Defendant's Statement of Additional Material Facts should be stricken for failure to comply with Local Rule 56 based on improper argumentation and lack of record citations in Plaintiff's responses. To the extent that Plaintiff's responses to Defendants' Statement of Additional Material Facts contained in Docket # 21 fail to comply with Local Rule 56(d), they are STRICKEN, and Defendants' motion to strike Plaintiff's responses to Defendant's Statement of Additional Material Facts is GRANTED.

Because Defendants' motions are granted, "Defendants' Reply to Plaintiff's Objection to Defendant's Motion to Strike and to Introduction of New Issues" (Docket # 28) and "Defendants' Motion to Strike Pleading Entitled 'Plaintiff's Objection to Defendants' Motion to Strike and to the Introduction of New Issues' " (Docket # 29) are MOOT.[3]

## II. Cross–Motions for Summary Judgment

### A. Standard of Review

■ In ERISA cases where the decision is to be made by the court based solely on the administrative record, summary judgment is "merely a mechanism for tendering the issue." *Liston v. Unum Corp. Officer Severance Plan,* 330 F.3d 19 (1st Cir.2003). In the case at hand, the dispute can and should be resolved on the basis of the administrative record. In cases where the administrator's decision is reviewed under an "arbitrary and capricious" standard of review, the First Circuit has held that "at least some very good reason is needed to overcome the strong presumption that the record on review is limited to the record before the administrator." *Liston,* 330 F.3d at 23. Likewise, "[e]ven where *de novo* review exists under ERISA, it is at least doubtful that courts should be in any hurry to consider evidence or claims not presented to the plan administrator." *Id.* at 24. Although a claim of corruption is the type of case in which it may be appropriate to consider evidence outside the administrative record, *see Kolling v. Am. Power Conversion*

---

3. The Court does note that "Plaintiff's Objection to Defendants' Motion to Strike and to the Introduction of New Issues" violated the page limits of Local Rule 7(e) and was non-responsive to Defendants' Motion to Strike. Moreover, much of Plaintiff's initial Statement of Material Facts is impermissibly argumentative and/or unsupported by citations to the record. In order to avoid unnecessary expense and possible future sanctions, the Court advises Plaintiff's counsel to read the Local Rules of the United States District Court for the District of Maine, and to comply with those rules in all future filings with this Court.

*Corp.,* 347 F.3d 11, 14 n. 6 (1st Cir.2003), this case is readily resolved in Plaintiff's favor without considering her claims of corruption, even if she has not waived her arguments in that respect.[4]

Following *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the denial of benefits by an administrator of a plan covered by ERISA is reviewed by courts using an "arbitrary and capricious" standard only if the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. If the terms of the plan do not give the administrator or fiduciary discretionary authority to determine eligibility or construe the terms of the plan, judicial review proceeds under a *de novo* standard. *See id.* at 115, 109 S.Ct. 948. The parties are in agreement that the terms of the plan in question do not afford the administrator the discretionary authority necessary to avoid *de novo* review by this Court. Thus, the question before this Court is whether the decision to deny Ms. Curtin's claim was correct. *See Perry v. Simplicity Engineering,* 900 F.2d 963 (6th Cir.1990).

### B. Background

#### 1. Insurance Policy and Pertinent Provisions

On November 18, 1997, Lillian Curtin sustained serious injuries in an automobile accident. At the time of the accident, Ms. Curtin was insured under an accidental death and dismemberment policy adminis-

tered by Unum Life Insurance Company (the "Policy"). Under the terms of the Policy, Ms. Curtin would receive a one-time lump sum payment of $100,000 if she sustained a "Permanent Total Disability" while insured. The Policy provides:

> "Permanent Total Disability" means that an Insured Employee is unable to engage in any occupation or employment for which he or she is fitted by reason of education, training, or experience for the rest of his or her life. Permanent Total Disability must have existed for twelve consecutive months and be determined by a competent medical authority to be permanent, total and continuous.

The benefit is to be paid in situations where: (1) an insured individual sustains Permanent Total Disability because of a covered injury within 180 days after the date of accident; and (2) the disability continues for twelve consecutive months.

Ms. Curtin contends that she meets these requirements, and is therefore entitled to the lump sum payment. Defendants contend that Ms. Curtin has not sustained a Permanent Total Disability and is not entitled to the lump sum payment. A review of the pertinent facts follows.

#### 2. Medical Information in the Administrative Record

The injuries sustained by Ms. Curtin in the automobile accident included numerous broken bones including fractures in both legs, a fractured pelvis, a transected aorta, and other major internal organ damage. As a result of the accident, Ms. Curtin

---

4. Ms. Curtin's motion for summary judgment indicated that she intended to bring into issue what she alleged was Defendants' corporate culture of denying claims in bad faith to save money. When Defendants responded with their motion for continuance pursuant to Federal Rule of Civil Procedure 56(f), to conduct discovery regarding Ms. Curtin's allegations

of bad faith, Ms. Curtin objected and indicated that "both parties have become quite familiar [with] the paper record in this case." Ms. Curtin stated that if the case could not be resolved in a motion for summary judgment she would be prepared to go to trial with no preliminary discovery.

underwent an extensive series of surgeries and was hospitalized for a month, followed by almost three months at an inpatient rehabilitation center. She was discharged on March 9, 1998, to receive physical therapy at her home.

The medical record following her discharge from the rehabilitation center consists of the records of Dr. Leo Troy, an orthopedic surgeon and Dr. Ross Reel, Ms. Curtin's primary care physician. While a doctor and a nurse at Unum reviewed Ms. Curtin's medical records and made reports that constitute a part of the record, no independent medical examination was requested by Defendants.

On March 25, 1999, Ms. Curtin visited both Dr. Reel and Dr. Troy. Dr. Reel performed a physical examination of Ms. Curtin. Dr. Reel noted that she was "here for followup; doing well except for weight gain; will see nutritionist." He diagnosed Ms. Curtin with hypertension, hypothyroidism, esophagitis, obesity, and hypocholesterolemia. Dr. Troy saw Ms. Curtin for fracture follow-up; he noted that Ms. Curtin experienced pain and limitation of movement due to her hip replacement surgery and heterotopic bone formation. Because Ms. Curtin was concerned that it was awkward for her to walk, Ms. Curtin and Dr. Troy discussed exercise options. Throughout 1999, Ms. Curtin continued to see Dr. Reel for cholesterol and thyroid problems.

On March 1, 2000, Ms. Curtin met with Dr. Reel for another physical examination. Dr. Reel noted that Ms. Curtin had "no complaints," that she "does a lot of walking, does all the housework," and that she lived with her mother, who was in the early stages of Alzheimer's disease. Dr. Reel stated that Ms. Curtin was overweight, and ordered a sleep study to rule out sleep apnea.

On April 20, 2000, Ms. Curtin visited Dr. Troy for pain in her lower back. Dr. Troy prescribed a shoe lift to resolve a leg length inequality resulting from the accident. Ms. Curtin returned to Dr. Troy on October 26, 2000 for a follow-up visit. Dr. Troy noted that she was still in pain, but that she was "doing otherwise reasonably well with her shoe lift. She is ambulating with cane assist and will continue with rehabilitation exercises and anti-inflammatory medication and return for evaluation here in six months."

On April 10, 2001, Ms. Curtin met with Dr. Reel regarding severe pain in her back, and Dr. Reel adjusted Ms. Curtin's prescription regimen. On May 31, 2001, Ms. Curtin visited Dr. Reel for a physical examination; Dr. Reel's notes of the visit indicate that Ms. Curtin had "no complaints."

On June 21, 2001, Ms. Curtin met with Dr. Troy for an orthopedic followup visit. Dr. Troy's notes state: "She clearly is not employable at this time in any occupation except for something very sedentary." He noted that Ms. Curtin would "continue with conservative care and return for evaluation in six months." On the same date, Dr. Troy completed a Unum form in connection with Ms. Curtin's claim for disability benefits. On the insurance form, Dr. Troy indicated that Ms. Curtin should not stand for more than 20 minutes or walk for more than 10 minutes, and that she must use a cane. He stated that her prognosis was poor and that she had achieved maximum recovery. In a section of the form that asked the physician to indicate how many hours in an eight-hour work day the patient could perform each of four listed levels of activity (sedentary, light, medium and/or heavy), Dr. Troy placed a checkmark (rather than a numeral) next to "Sedentary Activity."

### 3. Defendants' Review of Plaintiff's Claim

Defendants received Ms. Curtin's claim on April 16, 2001. On September 9, 2001, Virginia Reynolds, a Unum nurse, reviewed Dr. Troy's office notes and determined that the restrictions and limitations listed for Ms. Curtin did "not appear consistent with [her] stated activities." Nurse Reynolds observed that Dr. Troy's office notes indicated that Ms. Curtin could engage in "something very sedentary," and concluded that Ms. Curtin "would have sed[entary] capacity as indicated by [attending physician]."

After Nurse Reynolds' review, the "Customer Care Specialist" assigned to Ms. Curtin's file called Dr. Troy to clarify what he had intended when he placed a checkmark on the line on Unum's form that requested the number of hours that Ms. Curtin could engage in sedentary work in an eight-hour workday. The notes from that conversation indicate that Dr. Troy:

> state[d] he does not believe she is employable at all due to heteratopic [sic] bone in her hip. He state[d that] she can not even sit for more than 10–15 minutes at a time, she uses a cane and cannot walk over 10 min.... with the osteoarthritis she can barely move.

In the telephone conversation, Dr. Troy clarified that Ms. Curtin could not engage in sedentary activity for any number of hours in an eight-hour work day, and (according to the file notes) that "she [was] unemployable."

Following this conversation with Dr. Troy, Nurse Reynolds revisited her evaluation of Ms. Curtin's file, and apparently based on the conflict between her conclusion and Dr. Troy's evaluation of Ms. Curtin's employment abilities, referred the file to an onsite physician.

Dr. Lawrence Broda, Unum's onsite physician, reviewed the office notes of Drs. Troy and Reel and the results of an October 2000 x-ray. Despite the telephone conversation between Dr. Troy and the Customer Care Specialist and the ambiguity in the form completed by Dr. Troy, Dr. Broda reported in his review that Ms. Curtin's attending physician had stated that she had sedentary work capacity for eight-hour days. Dr. Broda concluded that he *agreed* that Ms. Curtin had full time sedentary work capacity. Following an email from the Customer Care Specialist to Nurse Reynolds noting the discrepancy between Dr. Broda's interpretation of Dr. Troy's opinion and Dr. Troy's opinion as expressed over the telephone, Dr. Broda reviewed his report. Dr. Broda confirmed his earlier conclusion and wrote at the bottom of the report: "Ambulating with cane, providing care for parent. Has [full-time] sed[entary] capacity." Dr. Broda's notes never indicate an awareness of the telephone conversation between Dr. Troy and the Customer Care Specialist or Dr. Troy's opinion that Ms. Curtin was not employable even in a sedentary capacity.

Following Dr. Broda's initial review, Unum commissioned a transferable skills analysis ("TSA"). As framed in the report, "[t]he request was made to find suitable sedentary occupations within the education and work background of Ms. Curtin." Based on the erroneous information that "[h]er attending physician, Dr. Troy, has released her to work in a full-time sedentary capacity," the TSA found five positions consistent with Ms. Curtin's past work and education and the reported medical restrictions and limitations. Because the TSA is founded on data which is at the center of this dispute (Ms. Curtin's ability to engage in sedentary activity), it provides no support for the conclusion that Ms. Curtin is employable.

On December 21, 2001, Unum sent a two-page letter to Ms. Curtin's attorney denying her claim, indicating that "the Disability Specialist has determined that Ms. Curtain [sic] has full time sedentary work capacity," and enumerating the five sedentary activity positions identified in the TSA. In response, Ms. Curtin's attorney sent a letter of appeal, accompanied by a letter from Dr. Troy. The appeal letter mentioned that '[i]f Ms. Curtin had been interviewed by Unum's disability analyst, she would have been informed that . . . Ms. Curtin is unable to sit, stand or walk for any period of time. She is required to take frequent breaks, to rest by laying [sic] down and/or reclining due to fatigue and pain." It also noted that Ms. Curtin had been awarded Social Security Disability Insurance benefits based on the disabilities for which she sought benefits from Unum. Dr. Troy's attached letter, dated January 31, 2002, stated that Ms. Curtin had suffered "massive, multiple trauma" in a motor vehicle accident, and that "[d]ue to residual loss of hip, knee and ankle function, Lillian Curtain [sic] is orthopaedically unfit for employment even in sedentary, light work category. She is permanently totally disabled. Comment on her disability related to her internal organ damage can be obtained through her primary care physician."

On April 2, 2002, Unum sent Ms. Curtin's attorney a letter indicating that the initial denial had been affirmed and that Ms. Curtin would not be awarded benefits under the policy. The second denial letter was more detailed than the first, and laid out the pertinent language of the policy, as well as the medical information reviewed in connection with the decision to deny benefits. Although the second denial letter described Dr. Troy's January 31, 2002 letter and his conversation with Unum's "Customer Care Specialist" along with most of the medical information laid out above, the letter did not state that (or explain why) these reports from Dr. Troy were not deemed credible. The letter also noted that Ms. Curtin's receipt of Social Security Disability Income benefits "does not in and of itself entitle Ms. Curtin to disability benefits under other plans." In response to further correspondence from Ms. Curtin's attorneys, Unum sent a letter to Ms. Curtin's current attorney on May 2, 2003 indicating that Ms. Curtin "has exhausted all administrative remedies" and returning additional documents that had been submitted for review.

C. Discussion

■ In their opposition to Plaintiff's motion for summary judgment and their cross-motion for summary judgment, Defendants argue that Ms. Curtin did not provide documentation to show that she suffered a permanent total disability within 180 days of the accident and that she did not remain permanently and totally disabled for the ensuing twelve-month period. In support of this position, Defendants point out that neither Dr. Troy nor Dr. Reel stated that she was unemployable during the periods in question, and made no mention of such limitations until asked on insurance forms about such limitations. However, Ms. Curtin was not employed or seeking employment during those time periods, so there would have been no reason for either doctor to include in his notes an indication of her eligibility for or ability to engage in gainful employment.

Unum had no basis to disbelieve the information provided by Dr. Troy. His error on the insurance form was corrected both over the telephone and in writing in connection with the administrative appeal. He did not change his opinion following an adverse decision by Unum or under any other questionable circumstances. *Compare Brigham v. Sun Life of Canada*, 317

F.3d 72, 85 (1st Cir.2003). He simply clarified the meaning of his response to a question on a form, a clarification that happened to be unfavorable to Unum.

There was no significant discrepancy between Dr. Troy's office notes and the insurance form filled out the same day—any variation was minor, and represented a change in language, not a change in intent. No examining doctor disagreed with Dr. Troy's conclusion that she was unable to work even in a sedentary occupation. Office notes indicating that Ms. Curtin was able to perform some housework and provide care for her mother do not evidence an ability to participate in a competitive work environment. See Cook, 320 F.3d at 23. This Court finds as a matter of fact that Ms. Curtin submitted to Unum ample evidence to support a finding that she had suffered a Permanent Total Disability as defined in the Policy.

■ Whatever the basis for their conclusions, Unum's employees concluded otherwise and Unum seeks to rely on the reports of Nurse Reynolds and Dr. Broda to support its denial of Ms. Curtin's claim. Unum cites Black & Decker Disability Plan v. Nord, 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) and Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co., 169 F.3d 43 (1st Cir.1999) for its position that it is "entitled to consult and rely on its own experts and is not required to accept the word of Curtin's doctors or Curtin herself." (Def.'s Cross–Mot. Summ. J. (Docket #15) at 12.) Unfortunately for Unum, these cases do not stand for the proposition that an insurer may deny claims based only on the unsupported conclusions of its employees. Black & Decker simply establishes that ERISA plan administrators "are not obliged to accord special deference to the opinions of treating physicians." 123 S.Ct. at 1967. It does not allow an insurer to disregard the opinion of a treating physician in the absence of medical evidence contrary to the treating physician's opinion. Instead, the Black & Decker decision makes clear that "[p]lan administrators ... may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Id. at 1972. Significantly, the Black & Decker case involved a claimant whose treating physician opined that the claimant was incapable of working, but as to whom an independent medical examiner concluded that the claimant could continue his sedentary work activities with some accommodations. See id. at 1968.

Ferrara & DiMercurio involved a claim against the insurer of a fishing vessel for failure to settle an insurance claim in bad faith, a violation of Massachusetts' unfair practices statute. As Unum points out, the First Circuit in that case held that "[i]nsurers are both encouraged and entitled to rely ... on the advice of expert consultants in evaluating liability." 169 F.3d at 56. However, the Ferrara & DiMercurio case involved a claim that the insurer had reason to believe was caused by arson based on the expert opinions of two fire analysts, both of whom had made extensive examinations of the remains of the insured vessel.

Unlike the situations presented in Black & Decker and Ferrara & DiMercurio, the insurer in the case at issue here has not developed any support in the record for its position that Dr. Troy exaggerates the extent of Ms. Curtin's disability (and eligibility for insurance benefits). This case is more analogous to the situation presented in Cook v. Liberty Life Assurance Co. of Boston, 320 F.3d 11 (1st Cir.2003). In Cook, an ERISA case evaluated under the "arbitrary and capricious" standard of review, the court found the insurer's denial of benefits to be unreasonable where the

treating physician was clear as to the claimant's ability to engage in gainful employment, there was no reason to conclude that the doctor was colluding with the claimant, and the insurer had not "developed any contradictory evidence in the record to support its decision." *Id.* at 23. The *Cook* court stated:

> There may well be cases where the opinion of the claimant's treating physician can be rejected without reliance on any contradictory medical evidence developed by the plan administrator. Here, however, without another reasonable basis for rejecting [the treating physician's] opinion, the absence of that contradictory evidence is fatal to [the insurer's] case.

*Id.* While Unum did submit Ms. Curtin's medical records to review by an onsite doctor, Dr. Broda's report merely states that he agreed with Dr. Troy that Ms. Curtin has full-time sedentary work capacity. Dr. Broda's report does not address the ambiguity in Dr. Troy's completion of the Unum form or the clarification in Dr. Troy's telephone conversation with the Unum representative. As a result, the Court finds that Dr. Broda's report can hardly be said to constitute evidence that Ms. Curtin did not sustain a Permanent Total Disability.

█ In the second denial letter, Unum correctly asserts that Ms. Curtin's receipt of Social Security Disability Income benefits does not in and of itself entitle Ms. Curtin to benefits. *See Pari–Fasano v. ITT Hartford Life & Accident Ins. Co.,* 230 F.3d 415, 420 (1st Cir.2000). However, the Court finds that the determination of the Social Security Administration that Ms. Curtin is disabled because of the injuries sustained in the November 18, 1997 automobile accident is relevant to, though it does not control, a determination of whether Ms. Curtin suffered a Permanent

Total Disability as defined in the Policy. *See id.*

Based on the evidence before it, this Court ultimately concludes that Unum's decision was incorrect. In a case such as this where the plan administrator erred as to the claimant's eligibility for benefits, the district court may "either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits." *Cook,* 320 F.3d at 24. In this case, there is no argument that the administrative record is incomplete, and this Court sees no reason why the question of Ms. Curtin's eligibility for benefits should be subject to further proceedings before the plan administrator. Therefore, the Court will award Ms. Curtin the $100,000.00 lump sum payment provided for in the Policy.

### D. Additional Remedies

█ Two issues remain to be resolved: prejudgment interest and attorney's fees. The court will address each in turn. Prejudgment interest is "available, but not obligatory, in ERISA cases." *Cottrill v. Sparrow, Johnson & Ursillo, Inc.,* 100 F.3d 220, 223 (1st Cir.1996). Prejudgment interest is awarded to "ensure that an injured party is fully compensated for its loss." *City of Milwaukee v. Cement Division, Nat. Gypsum Co.,* 515 U.S. 189, 195, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995). "Ordinarily, a cause of action under ERISA and prejudgment interest on a plan participant's claim both accrue when a fiduciary denies a participant benefits." *Cottrill,* 100 F.3d at 223. Ms. Curtin's cause of action accrued on April 2, 2003, the date that Unum affirmed its original decision in the administrative appeal. Likewise, prejudgment interest shall be calculated from that date. *Cf. Salcedo v. John Hancock Mut. Life Ins. Co.,* 38 F.Supp.2d 37, 42–43 (D.Mass.1998) (inter-

preting *Cottrill* to mean that the statute of limitations in an ERISA case begins to run from the denial of the appeal, not from the initial denial of benefits).

Guided by equitable considerations, this Court has broad discretion to choose the rate of prejudgment interest. *See Cottrill,* 100 F.3d at 225. Having considered the best means to compensate Ms. Curtin for the loss of use of her disability benefit, the Court determines that prejudgment interest shall be calculated based on the federal prime rate for the period in question. *See Pimentel v. Jacobsen Fishing Co., Inc.,* 102 F.3d 638, 640 (1st Cir.1996) (noting in dicta that using the prime rate to calculate prejudgment interest "would be reasonable"). Thus, the Court hereby awards Plaintiff prejudgment interest for the period beginning April 2, 2003 up until the date of entry of judgment in this case, such interest to be calculated using the relevant federal prime rates and compounded daily.[5]

▪ Ms. Curtin's complaint also requested an award of attorney's fees, and ERISA, in fact, provides for the award of such fees in the Court's discretion. 29 U.S.C. § 1132(g). In deciding whether to award such fees, courts consider the following five factors:

> (1) the degree of culpability or bad faith attributable to the losing party; (2) the depth of the losing party's pocket, i.e., his or her capacity to pay an award; (3) the extent (if at all) to which such an award would deter other persons acting under similar circumstances; (4) the benefit (if any) that the successful suit confers on plan participants or beneficiaries generally; and (5) the relative merit of the parties' positions.

*Cottrill,* 100 F.3d at 225. These factors are "exemplary rather than exclusive." *Id.*

▪ With respect to the first factor—culpability—this Court finds that Defendants exhibited a low level of care to avoid improper denial of claims at great human expense. Defendants clearly have the capacity to pay Ms. Curtin's attorney's fees. An award of attorney's fees in this case is an important deterrent measure: first, because of the limited remedies available under ERISA to plaintiffs such as Ms. Curtin, insurers should not have incentive to deny meritorious claims with the assumption that a fair number of claimants will not sue; and second, because an award of attorney's fees encourages attorneys to take on difficult and contentious ERISA cases. As for the fourth factor, the benefit conferred on other plan participants from this case is likely to be minimal, since the resolution of this case turned on facts specific to Ms. Curtin's situation. Finally, the Court concludes that Defendants' position had little merit relative to Ms. Curtin's claim for her disability benefit. Having weighed each of these factors, the Court concludes that an award of attorney's fees is proper in this case. Nevertheless, at this juncture, the Court does not have any basis upon which to determine an appropriate amount for an award of attorney's fees. Therefore, the Court directs Plaintiff to file a motion for attorney's fees following the procedures set forth in Federal Rule of Civil Procedure 54(d) and Local Rule 54.2.

### III. Conclusion

For the reasons explained above, the Court hereby GRANTS Plaintiff's Motion for Summary Judgment (Docket # 8) and

---

5. Historic daily prime rates are available at http://www.federalreserve.gov/releas- es/h15/data/d/prime.txt.

ORDERS that Defendants pay Plaintiff the lump sum payment due under the Policy together with prejudgment interest. The amount of attorney's fees awarded shall be resolved upon the Court's receipt of papers from the parties as directed above.

SO ORDERED.