**Thomas E. BLACK, Plaintiff**

v.

**UNUM LIFE INSURANCE COMPANY OF AMERICA and UnumProvident Corporation, Defendants.**

**No. 02–CV–176–P–S.**

United States District Court, D. Maine.

June 22, 2004.

---

Jon Holder, Holder & Grover, Portland, ME, for Thomas E Black.

Patricia A. Peard, Bernstein, Shur, Sawyer, & Nelson, Ronald W. Schneider, Jr., Bernstein, Shur, Sawyer, & Nelson, Portland, ME, for Unumprovident Corporation, Unum Life Insurance Company of America.

## ORDER

SINGAL, Chief Judge.

Plaintiff Thomas Black alleges that Unum Life Insurance Company of America and UnumProvident Corporation (together "Defendants" or "Unum") unlawfully terminated his long term disability benefits. Through this action, he seeks relief pursuant to the Employee Retire-

ment Income Security Act ("ERISA"), 29 U.S.C. § 1132. Presently before the Court are: Defendants' Motion for Summary Judgment (Docket # 53), Plaintiff's Motion for Summary Judgment (Docket # 55) and Defendants' Motion to Strike Portions of Plaintiff's Objection to Defendants' Statement of Material Facts (Docket # 66). As explained below, the Court GRANTS IN PART and DENIES IN PART all three motions.

## I. Motion to Strike

Before addressing the merits of the cross motions for summary judgment, the Court must resolve Defendants' Motion to Strike, which argues that Plaintiff has failed to comply with certain requirements of Local Rule 56. Defendants object to three particular portions of Plaintiff's Objections to the Defendants' Statement of Material Facts (Docket # 64), specifically Plaintiff's responses to paragraphs 4, 14 and 23 of Defendants' Statement of Material Fact (Docket # 54).

With respect to Plaintiff's responses to both paragraphs 4 and 23, Defendants contend that Plaintiff has not provided any record citation to support his designation of "qualified" as to each of these statements of material fact. In accordance with Local Rule 56, a party must support a qualification with a record citation and the Court "may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment." Local Rule 56(c) & (e). Due to Plaintiff's failure to provide record citation to support its qualification, the Court will disregard Plaintiff's responses to paragraphs 4 and 23.

In a change of course, Defendants object to Plaintiff's relatively lengthy response to paragraph 14 on the grounds that this response essentially contains too much information. Specifically, Defen-

dants contend that the response to paragraph 14 contains argument and information that Plaintiff should have conveyed in a separate section of additional facts as contemplated under Local Rule 56(c). Notably, Plaintiff's response to paragraph 14 cites to and quotes the same pages of the administrative record that Defendants cited in support of paragraph 14's statement of material fact. Thus, the Court reads Plaintiff's qualification as urging the Court to review and consider additional portions of the document rather than just accept Defendants' summary of the document. Defendants are correct to point out that Plaintiff could have accomplished this objective by submitting "additional facts" as contemplated by Local Rule 56(c). Indeed, this procedure might have been preferable in that it would have provided Defendants an opportunity to respond pursuant to Local Rule 56(d). However, after reviewing Plaintiff's response to paragraph 14 in context, the Court does not believe that Defendants suffered any prejudice and the Court finds no basis for striking Plaintiff's qualification to paragraph 14.

For these reasons, the Court DENIES Defendant's Motion to Strike to the extent it asks the Court to disregard Plaintiff's response to paragraph 14 and GRANTS Defendant's Motion to Strike to the extent is seeks to have this Court disregard the unsupported qualifications made by Plaintiff in response to paragraphs 4 and 23.

## II. Cross–Motions for Summary Judgment

### A. Standard of Review

The procedural posture of this case is strikingly similar to that of *Curtin v. Unum Life Ins. Co.*, 298 F.Supp.2d 149 (D.Me.2004), another ERISA case recently decided by this Court. As explained in *Curtin,*

In ERISA cases where the decision is to be made by the court based solely on the administrative record, summary judgment is "merely a mechanism for tendering the issue." *Liston v. Unum Corp. Officer Severance Plan*, 330 F.3d 19 (1st Cir.2003). . . .

Following *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101[, 109 S.Ct. 948, 103 L.Ed.2d 80] (1989), the denial of benefits by an administrator of a plan covered by ERISA is reviewed by courts using an "arbitrary and capricious" standard only if the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. If the terms of the plan do not give the administrator or fiduciary discretionary authority to determine eligibility or construe the terms of the plan, judicial review proceeds under a *de novo* standard. *See id.* at 115[, 109 S.Ct. 948].

*Curtin*, 298 F.Supp.2d at 152–53.

■ As in *Curtin*, the parties here "are in agreement that the terms of the plan in question do not afford the administrator the discretionary authority necessary to avoid *de novo* review by this Court. Thus, the question before this Court is whether the decision to deny [Plaintiff]'s claim was correct." *Id.* at 153 (citing *Perry v. Simplicity Engineering*, 900 F.2d 963 (6th Cir. 1990)). The Court answers this question by reviewing the administrative record while keeping in mind that it is Plaintiff's burden to establish that he is entitled to recover benefits.

### B. Background

### 1. Plaintiff's Unum Insurance Policy

In December 1994, Plaintiff Thomas Black began working for Active Trucking

Service, Inc. ("ATS"), a company located in Bridgewater, New Jersey. As a result of his employment with ATS, Black was covered by a group long term disability insurance policy issued by Unum Life Insurance Company and bearing the Policy Number 106391 002 (the "Policy").

In relevant part, the Policy provides:

When the Company receives proof that an insured is disabled due to sickness or injury and requires the regular attendance of a physician, the Company will pay the insured a monthly benefit after the end of the elimination period. The benefit will be paid for the period of disability if the insured gives the Company proof of continued:

1. disability; and

2. regular attendance of a physician.

(UPCL 676.)[1] The Policy further defines "disability" and "disabled" as "because of injury or sickness: 1. the insured cannot perform each of the material duties of his regular occupation; and 2. after benefits have been paid for 24 months, the insured cannot perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education or experience." (UPCL 678.) The Policy does not contain any specific definition of "occupation" or "regular occupation."

### 2. The Initial Claim & Decision to Award Benefits

Due to a heart condition, Black stopped working at ATS in late December 1999. He subsequently filed a claim for long term disability benefits. This claim initially required Unum to examine Black's claimed "injury or sickness" and determine whether Black could not work in his "regu-

---

[1] The Court has been provided with a copy of the full administrative record in this case containing a "UPCL" Bates prefix. As necessary, the Court's order will refer to the administrative record by using these Bates numbers.

lar occupation" as a result of this medical condition.

### a. Black's Medical Condition

Black suffered from a long history of cardiac problems, particularly coronary artery disease ("CAD") and angina. Black's cardiac history dates back to September 1992 when he had triple bypass surgery after presenting at the emergency room with sustained chest pains. He was 38 years old at the time of this bypass surgery. Although Black initially did well after the surgery, by 1998 he was ·diagnosed with recurrent angina and was apparently suffering from CAD-related complications.

In connection with Black's initial claim for long term disability benefits, his attending physician, Dr. Antonucci, filed a statement in January 2000. The Attending Physician Statement form provided by Unum asked Dr. Antonucci to classify Black's functional capacity pursuant to the American Heart Association Classification system. Dr. Antonucci checked the box for "Class 3 (marked limitation)."[2] Dr. Antonucci's statement also described Black's physical impairment as "Class 4—Moderate limitation of functional capacity; capable of clerical/administrative (sedentary) activity (80–70%)." Dr. Antonucci's statement also noted his assessment that Black "can't do physical activity." (UPCL 271.)

A March 2000 medical review conducted by Unum as part of Black's initial long term disability claim concluded: "Given Mr. Black's extensive cardiac history, with persistent, regardless of maximum medical management, angina with exertion, it would be reasonable for Mr. Black to have [restrictions and limitations]: avoid strenuous physical activities—sedentary work capacity. Based on the information on file, the [restrictions and limitations] would be long term, and further deterioration may be anticipated." (UPCL 284.)

### b. Plaintiff's Occupation

During his tenure at ATS, Black worked as a land clearing manager. At the time of his initial application for benefits, Black described his job duties as including "bidding [&] estimating job sites, survey job site, hiring [&] firing employees, [and] collections." (UPCL 282.) Although Black had only worked for ATS since December 1994, he had worked as a land clearing manager for at least 15 years.

In reviewing Black's occupation in connection with his earlier claim for short term disability benefits, the administrative record notes that Black's occupation involved "prolonged standing and walking." (UPCL 274.) When it conducted a vocational assessment as part of Black's initial claim for long term disability benefits, Unum classified Black's occupation as Construction Superintendent. This occupation is generally considered "light duty" work meaning it "may require exerting up to 20lbs of force with significant standing and walking." (UPCL 296.)

---

**2.** The American Heart Association's Classification of Functional Capacity and Objective Assessment has 4 classes with Class IV reserved for the most serious cases of cardiac disease. Class III, the classification assigned to Black by his attending physician, is reserved for "[p]atients with cardiac disease resulting in marked limitation of physical activity. They are comfortable at rest. Less than ordinary activity causes fatigue, palpitation, dyspnea or anginal pain." Criteria Comm. of the N.Y. Heart Assoc., Nomenclature and Criteria for Diagnosis of Diseases of the Heart and Great Vessels 253–256 (9th ed.1994), *http://www.americanheart.org/presenter.jhtml?identifier=4569* (last visited June 22, 2004).

Regardless of the descriptions and classifications assigned to Black's occupation in connection with his initial claim, there was no dispute that Black's occupation was not a sedentary one and that he could not perform the material duties of this occupation.[3] Thus, after completing its review of Black's medical condition and occupation, Unum informed Black on March 30, 2000 that he would begin receiving long term disability benefits as of April 4, 2000 (which marked the end of the elimination period).

### 3. Defendants' Subsequent Review and Decision to End Benefits

The dispute in this case arises out of Unum's review of Black's claim approximately one year later. At that time, Unum asked Black to supply additional information to support his continued receipt of long term disability benefits.

In response, Black filed his own supplemental statement dated February 2001 in which he reported that he had not performed any of the duties of his regular occupation or any other occupation since his initial claim. He further reported that his medical condition did not prevent him from caring for himself and that his daily activities essentially consisted of watching TV and feeding his dogs.

### a. The Updated Medical Information

Unum also sought updated information from Black's medical care providers regarding his heart condition. By the time Black received Unum's request, he had moved to West Virginia and was under the care of a new attending physician, Dr. Alappat. By early 2001, Black had seen Dr. Alappat twice and was scheduled for a cardiolite stress test in order to evaluate recent chest pains.

In response to Unum's request, Dr. Alappat completed an attending physician statement dated March 7, 2001. In his statement, Dr. Alappat's assessment of Black's functional capacity was the same as Dr. Antonucci's earlier assessment—"Class 3—marked limitation." In response to the question, "What is your prognosis for recovery?" Dr. Alappat wrote, "[Patient] has reached maximal medical recovery." In response to questions regarding the restrictions and limitations on Black's ability to work, Dr. Alappat wrote, "[Patient's] activities are severely limited [due to] angina on minimal exertion." (UPCL 343.)

Unum also received medical records from Dr. Alappat's office showing the results of Black's recent tests, including a cardiolite stress test. This March 2001 stress test indicated that Black "achieved 74 percent of the maximum predicted heart rate and a workload of 10 Mets" with "no ST abnormality noted on the electrocardiogram." (UPCL 527.) Dr. Alappat's impression was that the stress test was "negative." The correlated cardiolite study showed an ejection fraction of 49 percent and found "dyskinesis of the apex" and a "severe perfusion defect" along with a "small" ischemia. (UPCL 528.) Dr. Alappat's notes from his follow up appointment with Black state that "patient did excellent on the treadmill, however his scan showed some amount of ischemia." Dr. Alappat further noted that he had "an extended discussion with [Black] and his wife regarding his prognosis and about the significance of the stress test." (UPCL

---

**3.** In fact, Unum's nurse review, dated February 25, 2000, noted that Black was "unlikely to regain functional capacity to return to job" although he might be able to work at a "sedentary one." (UPCL 497.)

524.) The substance of that discussion is not noted.[4]

#### b. Unum's Review of the Supplemental Information

In September 2001, Unum had an expert, Dr. DiDonna, review the updated medical information submitted by Black. Based on the March 9, 2001 stress test results and Dr. Alappat's recent notes, Dr. DiDonna concluded that Black "demonstrate[d] capacity for sustained light activity based upon the most recent stress test result. Although he has a small amount of LV ischemia and an apical left ventrical scar, there is no functional impairment from this or his other conditions. Permanent restrictions and limitations of medium or heavy lifting are tenable." (UPCL 531.)

Unum, in turn, based upon Dr. DiDonna's assessment, decided that Black no longer qualified for long term disability benefits and could return to his regular occupation. On October 1, 2001, Unum informed Black that it would not pay his benefits beyond September 28, 2001. In a letter explaining its decision, Unum explained that it had determined that Black's "restrictions and limitations would not prevent [him] from performing each of the material duties of [his] regular occupation as a manager of the Land Clearing department." (UPCL 539.)

In a letter dated October 1, 2001, Dr. Alappat asked Unum to reconsider its recent decision. Dr. Alappat explained that "[a]lthough [Black's] stress test appears to be normal, Mr. Black remains at high risk for myocardial infarction because of his underlying coronary artery disease. This is clearly evidenced by the number of interventions and the number of myocardial

infarctions that patient has had in the past. His condition has not changed during the last year, but his disability status has?" (UPCL 545.) Despite Dr. Alappat's letter attempting to clarify his assessment of Black's condition, Unum clearly disagreed believing that Black's condition had changed.

#### 4. Black's Attempts to Appeal Unum's Decision

Upon being informed of Unum's decision, Black appealed. In his appeal, Black essentially argued that the decision to end his benefits must be based on a misunderstanding of his medical condition and/or his occupation. As to his medical condition, Unum urged Black to provide "medical data" or other "objective evidence." Although Black had no additional information to provide on this front he did repeatedly request and offer to be examined by a Unum physician and he also asked to have Dr. DiDonna or another Unum representative speak with Dr. Alappat. Unum refused these invitations to conduct an exam or speak with Dr. Alappat.

Black did provide Unum with further information regarding his occupation. Specifically, Black provided Unum with a letter from Joseph Horner, President of ATS, describing the duties of a land clearing manager. In relevant part, Mr. Horner explained that a land clearing manager would be required to:

> [B]e ready to and able perform many of the same duties of the employees out in the field . . ., such as operating a chain saw if need be, help maintain roads, run equipment, tarp and untarp trailers, and in almost all cases, be responsible for

---

4. In his hand written letter appealing Unum's decision to terminate his benefits, Black indicates that Dr. Alappat told him "in person that I was going to die as a result of my heart condition" and that "there was something wrong with the left side of my heart" that could not be repaired. (UPCL 563.)

receiving and delivering all supplies ... which in most cases are in excess of 20 lbs. The job also requires a significant amount of walking, standing and driving on a daily basis.

(UPCL 570.) Black also separately provided a substantively similar description of his duties in his letter appealing Unum's decision. Black's appeal letter also noted that he had since seen two other doctors (Dr. Morris and Dr. Goddard) but that he was unable to get a letter from any doctor he had seen that would clear him to go back to work as land clearing manager.

As a result of Black's appeal letter and the letter from ATS, Unum conducted a review of its previous occupational classification of Black's position. In general, Unum's vocation review relied on descriptions and classifications taken from the Dictionary of Occupational Titles ("DOT"), a reference publication produced by the United States Department of Labor. Upon further review, Unum's vocational consultant could find "no specific DOT code for what amounts to a Land Clearing Manager" but concluded that "the core duties of the occupation" were "encompassed by the DOT Codes for Clearing Supervisor ... and Logging Supervisor ...." (UPCL 595.) Since both of these occupations are classified as "light," the consultant concluded that a land clearing manager is also a "light work" occupation even though the descriptions provided suggested Black's "particular job" might have "more physically demanding aspects." (UPCL 595.)

In a letter dated November 28, 2001, Unum informed Black that his appeal had been denied. This letter indicated that in reaching its decision, Unum relied on Dr. DiDonna's medical assessment as well as a vocational review done in response to Black's appeal to reach its conclusion that Black was, in fact, able to perform the material duties of his light work occupation. With respect to Black's present medical condition, Unum explained that "increased risk of myocardial infarction" did not entitle Black to benefits since "[t]he terms of the policy are not designed to provide benefits to those persons who might become disabled at some point in the future." (UPCL 613.) With respect to Black's occupation, Unum's letter explained that even if the duties of Black's job at ATS were "more demanding than is suggested by the light vocation classification.... [T]he intent of disability insurance is to provide a benefit if an individual is unable to perform the material duties of his occupation. The difference between an occupation and a job is that an occupation is a *vocation or profession* as typically performed in the general economy, whereas a *job* is a set of tasks or work duties performed for a specific employer." (UPCL 614.)

## C. Discussion

### 1. Defendants' Request for Summary Judgment on Behalf of UnumProvident Corporation

■ Before turning to its discussion of the merits, the Court addresses an argument raised in the latter portion of Defendants' motion for summary judgment; namely, Defendants' argument that UnumProvident Corporation ("UnumProvident"), the parent holding company of Unum Life, is a "superfluous" and "improper" party to this action, since Unum Life, the wholly owned subsidiary of UnumProvident, is the entity that issued and administered the insurance contract at issue in this case. (Defs. Mot. for Summ. J. (Docket # 53) at 9–11.) Defendants previously pressed this same argument through a motion to dismiss the case against UnumProvident. At that time, the Court denied the motion to dismiss UnumProvident in order to pro-

vide Plaintiff an opportunity to present facts supporting a claim against UnumProvident. (*See* Docket # s 30 & 34.)

Defendants correctly point out that "[t]he proper party defendant in an action concerning ERISA benefits is the party that controls administration of the plan." *Terry v. Bayer Corp.*, 145 F.3d 28, 36 (1st Cir.1998) (quoting *Garren v. John Hancock Mut. Life Ins. Co.*, 114 F.3d 186, 187 (11th Cir.1997)). Defendants argue that Plaintiff has failed to present any evidence suggesting that UnumProvident controlled the administration of the plan. In responding to Defendants' pending motion for summary judgment and in the context of this particular case, Plaintiff has failed to point to any evidence that would allow the Court to conclude that UnumProvident controls the administration of Black's plan.[5] In addition, Plaintiff essentially did not present any argument in response to Defendant's argument seeking summary judgment on behalf of UnumProvident.[6] On this basis, the Court deems Plaintiff's objection to entry of summary judgment on behalf of UnumProvident waived and GRANTS Defendant's request for entry of summary judgment as to Defendant UnumProvident Corporation.

### 2. The *De Novo* Review of the Record

In light of this ruling, the Court below conduct a *de novo* review of the record upon which Unum Life based its decision to terminate Black's benefits. Ultimately, the Court concludes that Unum's supplemental review in 2001 was incorrect on both fronts, in that both the medical review and the vocational review reached conclusions that were not supported by the administrative record.

### a. The Medical Review

In response to Unum's decision to suspend Black's disability benefits as of September 28, 2001, Black's attending physician, Dr. Alappat, asked, "His condition has not changed during the last year, but his disability status has?" While Unum dismissed Dr. Alappat's question as advocacy, this Court is left pondering the same question after completing a *de novo* review of the record.

■■■ Unum apparently believed that Black's condition had changed based on the record review completed by Dr. DiDonna, a physician hired by Unum. Generally, plan administrators may engage medical physicians to assist them in making disability determinations and plan administrators may credit the opinions of these consulting physicians over the opinion of a treating physician. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822,

---

5. In fact, in responding to Defendants' Statement of Material Facts, Plaintiff admits without qualification that the denial of Black's benefits as well as the denial of Black's appeal of the October 2001 decision to suspend benefits was undertaken by *Unum Life*. (*See* Pl.'s Obj. to Defs. SMF (Docket # 64) ¶¶ 1, 5, 18, 25, 28, 30 & 34–36.)

6. To the extent that Plaintiff's Reply to his own motion for summary judgment appears to contain some barely comprehensible argument regarding the motion for summary judgment in favor of UnumProvident, the Court deems this argument insufficient to preserve Plaintiff's objection. (*See* Pl.'s Reply (Docket # 68) at 2–3). In order to preserve his objection, Plaintiff needed to include and develop this argument, along with supporting facts, in his Response to Defendants' Motion for Summary Judgment. To the extent that the Court reads Plaintiff's Reply argument as a veiled suggestion that Plaintiff was unable to present facts essential to justify his opposition to the motion for summary judgment in favor of UnumProvident, the Court notes that Plaintiff was required to seek relief via Federal Rule of Civil Procedure 56(f)—something he did not do in response to Defendants' Motion for Summary Judgment.

832–34, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). That said, "[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 834, 123 S.Ct. 1965.

▇ In this Court's assessment, Dr. DiDonna's review is not reliable and it was unreasonable for Unum to rely on this review while ignoring (without explanation) the other medical information contained in the administrative record that overwhelmingly suggested that Black's condition had not improved to the extent that he could perform the material duties of his occupation.

Dr. DiDonna's report selectively relies on the March 2001 stress test results and a few of Dr. Alappat's comments while simply ignoring evidence that supported Black's claim of continued disability. For example, while Dr. DiDonna's assessment discusses Black's recent stress test in detail, there is no evidence that DiDonna's assessment compared these stress test results to Black's earlier stress test results, including the October 12, 1999 stress test. That stress test was part of the objective evidence Unum considered when it initially decided to award Black benefits in March 2000. A comparison of the October 1999 stress test and the March 2001 stress test show similar results and do not suggest that Black has undergone any substantial improvement.[7] Notably, this was the assessment of Dr. Alappat, Black's treating physician.[8]

Moreover, other elements of Dr. DiDonna's report suggest a review that was less than thorough. By way of example, Dr. DiDonna's reports that Black "apparently was stable on medication between 8/98 and 1/31/01." (UPCL 531.) Based on the administrative record, I appears that during this time period Black's condition, in fact, deteriorated to the extent that he stopped working and applied for disability benefits in December 1999. In addition, Dr. Di-

---

7. By way of example, Dr. DiDonna notes that Black achieved 10 METS in his March 2001 stress test. This is admittedly an improvement from Black's 8 METS achieved in October 1999. However, with respect to ejection fraction, the March 2001 result of 49% is just outside normal limits but shows a decrease from the 65% result obtained in October 1999. Notably, Dr. DiDonna's report refers to an earlier ejection fraction reading of 40% and thereby seems to conclude that the recent 49% reading was an improvement. However, this 40% reading was Black's ejection fraction reported by Dr. Antonucci around August 1998 when Black underwent cardiac catherization but was still working. ˙(*See* UPCL 483.) Thus, a comparison of the October 1999 and the March 2001 ejection fractions show a decline in Black's condition. (*See also* Defs. Opp. to Pls. SMF (Docket # 61) at 5 (discussing ejection fraction and quoting a treatise for the proposition that ejection fraction "is the single most important prognostic factor in chronic coronary artery disease") (citation omitted).)

8. While the Supreme Court has said that treating physicians are not due any "routine deference," *Black & Decker*, 538 U.S. at 832, 123 S.Ct. 1965, reason dictates that the assessment of an impartial physician who has actually examined a particular patient is likely to be more reliable than the assessment of an equally impartial physician who has only reviewed the paper file. In this case, Dr. DiDonna conducted a review of the papers and wrote a report detailing his opinion based on this review. Faced with the task of conducting a *de novo* review of Dr. Alappat's and Dr. DiDonna's contradictory assessments, the Court finds that absent some particular suggestion that Dr. Alappat's assessment is biased or otherwise not credible, Dr. Alappat's assessment is entitled to more weight. *But see Gannon v. Metropolitan Life Ins. Co.*, 360 F.3d 211, 214 (1st Cir.2004) (noting that when conducting a review under the more deferential arbitrary and capricious standard it is not appropriate for the Court to "to determine precisely how much weight" a plan administrator should have given to different evidence within the administrative record).

Donna's two page report incorrectly refers to Mr. Black as "Mr. Smith." While this may have been an innocent typographical error, it also suggests that portions of Dr. DiDonna's narrative may have simply been recycled from a previous medical review.

In contrast, Dr. Alappat, who had examined Black first hand, offered a reasonable assessment and basis for concluding that Black's condition had not improved to the extent that he was able to return to work. Unum has offered no explanation for its decision to credit the assessment of Dr. DiDonna over that of Dr. Alappat. Moreover, the objective evidence added to the administrative record in 2001 did not support Unum's conclusion that Black's condition had improved so much by April 2001 that Black essentially no longer suffered from the disability that caused Unum to award him benefits a year earlier.

In short, upon *de novo* review, the Court concludes that the administrative record did not support Unum's finding that Black's medical condition had improved to the extent that he could return to a light work occupation as of September 28, 2001.

### b. The Occupational Review

■ In the alternative, the Court also finds that Unum's classification of Black's occupation cannot survive *de novo* review. In its letter denying Black's appeal, Unum insisted that the differences between the duties described by Black and his employer versus the duties described in the DOT descriptions for Clearing Supervisor and Logging Supervisor were the difference between Black's "job" and his occupation

of land clearing manager. Since the Unum policy only covered a disability that prevented him from engaging in his occupation, Unum explained that under the policy Black was not entitled to benefits if he could not perform the job described by ATS.

In the Court's assessment, the duties described by Black called for a different classification of his occupation. In fact, the descriptions for both Clearing Supervisor and Logging Supervisor contain the following caveat apparently applicable to Black: "[e]xclude work leaders who spend 20 percent or more of their time at tasks similar to those of employees under their supervision and include them in the occupations which are most closely related to their specific duties." (UPCL 588 & 592.) In light of the discrepancies between the job description provided by Black and his employer and the DOT description for Clearing Supervisor and Logging Supervisor, it is inexplicable why Unum's vocational consultant did not consider the applicability of this caveat.

In light of the Court's ruling that the medical information did not support a finding that Black could return to light duty work, the Court need not proceed with the reclassification of Black's occupation. However, a brief review of the Dictionary of Occupational Titles in light of the above-quoted caveat suggests that reclassifying Black into "the occupations which are most closely related to [his] specific duties" could easily result in Black's occupation being considered a "medium work" or possibly a "heavy work" occupation.[9] A re-

9. The Dictionary of Occupational Titles defines "Medium Work" as "exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater that negligible up to 10 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Light

Work." Similarly, "Heavy Work" is defined as "Exerting 50 to 100 pounds of force occasionally, and/or 25 to 50 pounds of force frequently, and/or 10 to 20 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Medium Work." Dictionary of Occupational Titles app.

view of Dr. DiDonna's assessment suggests that even he would agree that Black's heart condition would not allow him to return to working in such an occupation.[10]

### 3. The Remedy: Remand versus Retroactive Reinstatement

In a case such as this where the plan administrator erred as to the claimant's eligibility for benefits, the district court may "either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits." *Cook v. Liberty Life Assurance Co.*, 320 F.3d 11, 24 (1st Cir.2003). In this case, the Court believes that the administrative record is clear with respect to Black's inability to perform the material duties of his regular occupation, and that Unum's conclusion that Black was able to perform those duties as of September 28, 2001 was clearly incorrect and not supported by the record as a whole. Therefore, the Court will award Black retroactive benefits for the period from September 28, 2001 to April 4, 2002.

As of April 5, 2002, the definition of "disability" changed pursuant to the terms of the Policy. Thus, as of that date, the relevant question became: whether Black was or is able to perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education or experience? Since Unum has never reached this question, it is not surprising that the current administrative record does not provide the Court with any basis for answering this question. Therefore, the Court will remand this question to Unum Life, as Defendants have requested.

The Court would be remiss if it did not acknowledge the quandary facing Unum on remand. The First Circuit has held that "[i]t would be patently unfair to hold an ERISA plaintiff has a continuing responsibility to update her former insurance company and the court on her disability during the pendency of her internal appeals and litigation, on the off chance that she might prevail in her lawsuit." *Cook*, 320 F.3d at 24–25. Although the current record does suggest the possibility that Black had sedentary work capacity as of early 2001, it is unclear whether this potential sedentary work capacity still existed as of April 4, 2002. As a result of Unum's decision to prematurely terminate benefits during the two year "own occupation" period, Unum's ability to review Black's medical condition for the period covering April 4, 2002 to present and thereby determine Black's capacity for work, sedentary or otherwise, may now be limited since it may encounter difficulty reconstructing the evidence necessary for its review.

### 4. Additional Remedies

Finally, as in *Curtin*, there remain two issues for the Court to resolve in light of its ruling on the cross-motions for summary judgment: prejudgment interest and attorney's fees. *See Curtin*, 298 F.Supp.2d at 158–59. As explained below, the Court applies the same reasoning it applied in *Curtin* and thereby reaches analogous conclusions on these two issues.

First, a court may award prejudgment interest in order to "ensure that

---

C (4th ed.1991), *http://www.oalj.dol.gov/public/dot/refrnc/dotappc.htm* (last visited June 22, 2004).

**10.** Notably, Dr. DiDonna's assessment concludes that "permanent restrictions and limitations of medium or heavy lifting are tenable." (UPCL 531.)

an injured party is fully compensated for its loss." *Milwaukee v. Cement Division, Nat. Gypsum Co.,* 515 U.S. 189, 195, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995). In ERISA cases, prejudgment interest is "available, but not obligatory." *Cottrill v. Sparrow, Johnson & Ursillo, Inc.,* 100 F.3d 220, 223 (1st Cir.1996). The Court concludes that prejudgment interest is appropriate in this case.

"Ordinarily, a cause of action under ERISA and prejudgment interest on a plan participant's claim both accrue when a fiduciary denies a participant benefits." *Cottrill,* 100 F.3d at 223. Black's cause of action accrued on November 28, 2001, the date that Unum affirmed its original decision in the administrative appeal. Likewise, prejudgment interest shall be calculated from that date. *Cf. Salcedo v. John Hancock Mut. Life Ins. Co.,* 38 F.Supp.2d 37, 42–43 (D.Mass.1998) (interpreting *Cottrill* to mean that the statute of limitations in an ERISA case begins to run from the denial of the appeal, not from the initial denial of benefits).

■ Guided by equitable considerations, this Court has broad discretion to choose the rate of prejudgment interest. *See Cottrill,* 100 F.3d at 225. Having considered the best means to compensate Mr. Black for the loss of use of his disability benefit, the Court determines that prejudgment interest shall be calculated based on the federal prime rate for the period in question. *See Pimentel v. Jacobsen Fishing Co., Inc.,* 102 F.3d 638, 640 (1st Cir.1996) (noting in dicta that using the prime rate to calculate prejudgment interest "would be reasonable"). Thus, the Court hereby awards Plaintiff prejudgment interest for the period from November 28, 2001 up through the date of entry of judgment in this case, such interest to be calculated using the relevant federal prime rates and compounded daily.[11]

■ Second, Black has also requested an award of attorney's fees, and ERISA, in fact, provides for the award of such fees in the Court's discretion. 29 U.S.C. § 1132(g). In deciding whether to award such fees, courts consider the following five factors:

> (1) the degree of culpability or bad faith attributable to the losing party; (2) the depth of the losing party's pocket, i.e., his or her capacity to pay an award; (3) the extent (if at all) to which such an award would deter other persons acting under similar circumstances; (4) the benefit (if any) that the successful suit confers on plan participants or beneficiaries generally; and (5) the relative merit of the parties' positions.

*Cottrill,* 100 F.3d at 225. These factors are "exemplary rather than exclusive." *Id.*

With respect to the first factor—culpability—this Court finds that this case presents an unfortunate example of Unum Life's exercise of a low level of care to avoid improper denial of claims, at great human expense. Defendant clearly has the capacity to pay Black's attorney's fees. An award of attorney's fees in this case is an important deterrent measure: first, because of the limited remedy available to ERISA plaintiffs, like Black, insurers should be dissuaded from prematurely suspending benefits with the hope that some claimants will not sue; and second, because an award of attorney's fees ensures that attorneys continue to take on ERISA cases in which the potential monetary award may be limited. As for the fourth factor, the benefit conferred on other plan participants from this case is likely to be

---

**11.** Historic daily prime rates are available at http://www.federalreserve.gov/releas- es/h15/data/d/prime.txt.

minimal, since the resolution of this case turned on facts specific to Black's situation. Finally, the Court concludes that Unum Life's position had relatively little merit compared to Black's claim for continuing his disability benefit. Having weighed each of these factors, the Court concludes that an award of attorney's fees is proper in this case and ensures that Plaintiff's victory is not merely a Pyrrhic one. In order to allow the Court to determine what is an appropriate fee, the Court directs Plaintiff to file a motion for attorney's fees following the procedures set forth in Federal Rule of Civil Procedure 54(d) and Local Rule 54.2.

## III. Conclusion

For the reasons explained above, the Court hereby GRANTS IN PART and DENIES IN PART both Defendants' Motion for Summary Judgment (Docket # 53) and Plaintiff's Motion for Summary Judgment (Docket # 55).

The Court ORDERS:

(1) that judgment be entered in favor of Plaintiff Thomas Black awarding him long term disability benefits for the period from September 28, 2001 through April 4, 2002, along with prejudgment interest to be calculated as the Court has directed in this Order;

(2) that judgment be entered in favor of Defendant UnumProvident Corporation thereby dismissing this case as to that defendant; and

(3) that the issue of whether Mr. Black is entitled to long term disability benefits for any or all of the period beginning April 5, 2002 be remanded for determination by the plan administrator.

SO ORDERED.