Walter TOOMEY, Plaintiff

v.

UNUM LIFE INSURANCE COMPANY OF AMERICA

and

UnumProvident Corporation, Defendants.

No. 03–CV–69–P–S.

United States District Court, D. Maine.

June 23, 2004.

Jon Holder, Holder & Grover, Portland, ME, for Walter F Toomey, Jr.

Patricia A. Peard, Ronald W. Schneider, Jr., Bernstein, Shur, Sawyer, & Nelson, Portland, ME, for Unumprovident Corpo-ration, Unum Life Insurance Company of America.

## ORDER

SINGAL, Chief Judge.

Plaintiff Walter Toomey alleges that Unum Life Insurance Company of America and UnumProvident Corporation (together "Defendants" or "Unum") unlawfully denied him long term disability benefits. Through this action, he seeks relief pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132. Presently before the Court are: Defendants' Motion for Summary Judgment (Docket # 40), Plaintiff's Motion for Summary Judgment (Docket # 42) and Defendants' Motion to Strike Portions of Plaintiff's Objection to Defendants' Statement of Material Facts (Docket # 59). For the reasons set forth below, Defendants' Motion to Strike is DENIED, Defendants' Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED.

## I. Motion to Strike

Before addressing the merits of the cross motions for summary judgment, the Court must resolve Defendants' Motion to Strike. This Motion was filed in connection with the statements of material fact, which each side was required to file in accordance with Local Rule 56. Through this motion, Defendants object to almost all of Plaintiff's responses that consist of anything more than "Admitted." Most, if not all, of Defendants' objections have some merit in that they detail Plaintiff's failure to comply with the letter of Local Rule 56.[1] Nonetheless, in this Court's assessment, conducting an intensive line-by-

---

1. Beyond these technical violations, both Plaintiff's Statement of Material Facts and Plaintiff's Objections to Defendants' Statement of Material Fact evidence a failure to understand and appreciate both the spirit and the purpose of this local rule. Local Rule 56 adopted a procedure by which the parties are required to direct the Court to the material facts within the record and the Court has no independent duty to consider any part of the

line review of Plaintiff's technical violations of Local Rule 56 would do little to assist the Court in achieving the goals of this local rule or resolving the merits of the pending cross motions for summary judgment. Thus, in an exercise of its discretion, the Court DENIES Defendant's Motion to Strike.

In general, Local Rule 56 contemplates that the Court will discount any statement of material fact or a response thereto that contains irrelevant argument or factual assertions that are not supported by appropriate record citation. *See* Local Rule 56(e). In accordance with these principles, the Court has disregarded most of the objectionable portions of Plaintiff's Objections to Defendants' Statement of Material Facts (Docket #53) brought to the Court's attention through Defendants' Motion to Strike. Moreover, the Court notes that its view of the facts and decision on the merits would not be changed if it had considered Plaintiff's objections.

Having conducted a complete review of both sides' statements of material fact and the responses thereto, it is clear that the only relevant factual disputes between the parties center on disagreement regarding attempts by both sides to summarize, excerpt and characterize various cited portions of the administrative record at issue in this case. The Court has resolved these disputes by conducting a first hand review of the administrative record focusing on the pages cited by the parties.[2] In accordance with this procedure, the Court lays out the material facts below as gleaned from the parties' submissions and the Court's review of the administrative record.

## II. Cross–Motions for Summary Judgment

### A. Background

#### 1. Plaintiff's Unum Insurance Policy

Plaintiff Walter Toomey ("Toomey") began working for F.W. Webb Company ("F.W.Webb") in Burlington, Massachusetts in August 1990. Through his employment with F.W. Webb, Toomey was covered by a group long term disability insurance policy issued by Unum Life Insurance Company bearing the Policy Number 341343 (the "Policy"). The Policy, by its terms, covers any person in "active employment" with F.W. Webb, with "active employment" defined as working at least 30 hours a week. (UACL 326 & 334.)[3]

In relevant part, the Policy provides:

---

record not referenced in the parties' statements of material fact. The rule is intended to focus both the parties and the Court on what facts are actually in dispute. With the material facts clearly laid out, the Court, in turn, can more efficiently and effectively determine when a case can be appropriately resolved via summary judgment. *See, e.g., Ricci v. Applebee's Northeast, Inc.,* 297 F.Supp.2d 311, 321 (D.Me.2003) ("Local Rule 56 was designed to halt the former summary judgment practice of submitting a voluminous record and leaving to the court the duty to comb the record in search of material facts.")

**2.** In many other cases, the Court might well resolve these issues related to the argumentative nature and mischaracterization of the stated material facts by summarily denying the motions for summary judgment on the basis of genuine issues of material fact. However, there is no doubt that this is a case that is properly resolved via the pending cross motions for summary judgment and the Court sees no reason to delay resolution of Plaintiff's claim. *See Curtin v. Unum Life Ins. Co.,* 298 F.Supp.2d 149, 152 (D.Me.2004) ("In ERISA cases where the decision is to be made by the court based solely on the administrative record, summary judgment is 'merely a mechanism for tendering the issue.'") (quoting *Liston v. Unum Corp. Officer Severance Plan,* 330 F.3d 19, 24 (1st Cir.2003)).

**3.** The Court has been provided with a copy of the full administrative record in this case containing a "UACL" Bates prefix. As necessary,

When the Company receives proof that an insured is disabled due to sickness or injury and requires the regular attendance of a physician, the Company will pay the insured a monthly benefit after the end of the elimination period. The benefit will be paid for the period of disability if the insured gives the Company proof of continued:

1. disability; and
2. regular attendance of a physician.

(UACL 321.) For employees such as Toomey, the Policy further defines "disability" and "disabled" as

[B]ecause of injury or sickness:

1. the insured cannot perform each of the material duties of his regular occupation; and
2. after benefits have been paid for 24 months, the insured cannot perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education or experience."

(UACL 323.)

In order to qualify for benefits, the Policy also requires that an employee satisfy an "elimination period" of 180 days. The policy defines "elimination period" as "a period of consecutive days of disability for which no benefit is payable." In calculating the 180 day elimination period, the Policy also provides that "[i]f disability stops during the elimination period for any 14 (or less) days, then the disability will be treated as continuous. But days that the insured is not disabled will not count towards the elimination period." (UACL 326.)

Another notable provision of the Policy defines and discusses the procedure for dealing with a "recurrent disability," defined as "a disability which is related to or due to the same cause(s) of a prior disability for which a monthly benefit was payable." As explained in the Policy: "A recurrent disability will be treated as part of a prior disability if, after receiving disability benefits under this policy, an insured: 1. returns to his regular occupation for less than six months; and 2. performs all of the material duties of his occupation." (UACL 318.) The Policy specifically contemplates that an insured who returns to work for more than six months would be required to complete a second elimination period before collecting additional benefits under the Policy.

In addition, the Policy also provides some coverage for a "partial disability," which it defines as:

[B]ecause of injury or sickness the insured, while unable to perform all the material duties of his regular occupation on a full-time basis is:

1. performing at least one of the material duties of his regular occupation or another occupation on a part-time or full-time basis; and
2. earning currently at least 20% less per month that his indexed pre-disability earnings due to that same injury or sickness.

(UACL 323.) However, the Policy's coverage of partial disabilities is limited to those periods of partial disability that fall "within 31 days of the end of a period during which [the insured] received disability benefits." (UACL 321.) Thus, similar to a "recurrent disability," it is prerequisite for collecting benefits under the Policy for a "partial disability," that an insured has previously qualified for and received payment of full disability benefits for some period of time.

Although an employee's coverage under the Policy generally ceased upon termi-

the Court's Order will refer to the administrative record by using these Bates numbers.

nation of employment or "cessation of active employment,"[4] the Policy explicitly provides for continuation coverage to any disabled employee who is receiving benefits or in the elimination period. (UACL 314.)

### 2. Plaintiff's Medical Condition & Recovery

On May 22, 2000, Walter Toomey suffered a seizure while at work. After an MRI, Toomey was diagnosed with a probable meningioma, a type of benign brain tumor. On May 27, 2000, he underwent a craniotomy to remove the tumor. The surgery was completed without complication. On that basis, Dr. Black, Toomey's surgeon and primary treating physician, along with the rest of his doctors, apparently hoped and expected that Toomey would make a full recovery. By all accounts, the follow up MRIs completed in July 2000, September 2000, March 2001 and August 2001 show that Toomey's original meningioma had been successfully removed and there was no evidence of recurrence.

Although the standard recovery period for a craniotomy is eight weeks, Toomey was still suffering from persistent right side weakness and numbness as well as fatigue eight weeks after his surgery. Toomey continued to receive physical therapy to treat these residual physical impairments and improvement was noted over time. Despite these improvements, Dr. Black explained in a letter to F.W. Webb dated February 2, 2001 that Toomey "continue[d] to experience numbness on his right side, as well as occasional balance problems which are the result of nerve damage". With respect to Toomey's prognosis, Dr. Black explained, "His progress to date is within our expectations. It is unclear at this time whether he will fully recover from this nerve damage." (UACL 197.)

About one year after Toomey's surgery, Dr. Black described Toomey's physical impairment as "minor residual leg and arm weakness, which cause him some discomfort." Despite this impairment, Dr. Black cleared Toomey to work up to six hours a day. Dr. Black's June 4, 2001 letter clearing Toomey to work also recommended that Toomey's work be scheduled early in the day to "coincide with his times of greatest stamina and tolerance."[5] (UACL 196.)

Approximately 22 months after Toomey's initial surgery, Dr. Black authored a letter, dated March 25, 2002, indicating his clinical reasons for concluding that Toomey was now disabled and unable to do his former job. In relevant part, Dr. Black explained: "Mr. Toomey was never able to regain his previous strength. Nor was he ever able to escape the unrelenting fatigue, the nerve pain and the weakness in his right arm and leg which is permanent despite substantial attempts at rehabilitation. Mr. Toomey has experienced headaches, dizziness and depression which is not uncommon in patients with frontal lobe tumors." (UACL 239.)

In addition to his residual physical impairments, Toomey was referred to a psychiatrist, Dr. Rogers, for evaluation of his complaints of diminished stamina, motivation and concentration in June 2001. Dr. Rogers' interview notes recount that Toomey expressed distress about his physical

---

**4.** It appears that the Policy may allow for an extension of benefits for 31 days after "an insured ends employment" in certain circumstances. (UACL 314.) However, this provision of the Policy is not relevant to this particular case.

**5.** F.W. Webb was apparently resistant to making this particular accommodation.

impairments and his work situation, including his perception that F.W. Webb wanted him to leave. As a result of this June 18, 2001 visit, Dr. Rogers diagnosed Toomey with a mild to moderate depression and prescribed a trial of antidepressant medications. On a follow up visit on September 27, 2001, Dr. Rogers reported that Toomey appeared to have benefitted from the medication and it was agreed that he would continue on the medication until January. Dr. Rogers' summary also indicated that Toomey was still reporting right side residual impairments but that he had begun a locksmith training program (UACL 231.) This second September 27, 2001 visit with Dr. Rogers is the most recent medical visit documented in the administrative record.

In general, the treatment notes from Toomey's follow up appointments in the months following his craniotomy describe various residual impairments, including numbness on his right side, balance problems and fatigue. With the passage of time, Toomey's physical condition appeared to gradually improve and eventually stabilize although it does not appear that he experienced a full recovery from his residual physical impairments. However, the administrative record also suggests that Toomey's residual impairments to his right side, combined with his attempted return to work in an environment that was not entirely accommodating, took a mental toll leaving him suffering from depression and anxiety.

### 3. Plaintiff's Absence and Return to Work

After his seizure and subsequent surgery, Toomey did not work for approxi-mately five months. During this absence, he received short term disability benefits directly from his employer. On or about October 17, 2001, Toomey attempted to begin his return to work as warehouse attendant at F.W. Webb. Initially, he returned to work on a very limited schedule working between four and twelve hours per week. Apparently, Toomey returned to work under an informal plan in which he was paid for the hours he worked and continued to receive partial short term disability payments to cover the time he was unable to work.[6] He gradually increased his hours to the point that by the beginning of May 2001, Toomey was working thirty hours a week and stopped receiving any short term disability payments from his employer. According to Toomey, his return to a thirty hour work week was prompted by his employer's insistence that Toomey either return to work full time or go out on long term disability. (UACL 49.) This work schedule and the perceived expectations of his employer proved to be more than Toomey could bear and he stopped working as of July 24, 2001. On that same day, Toomey filed this claim for long term disability benefits.

At the time he applied for benefits, Toomey had been totally out of work as a result of his brain tumor diagnosis from May 23, 2000 until October 17, 2000. From approximately October 17, 2000 until approximately May 1, 2001, Toomey had worked a limited schedule under which he averaged approximately twelve hours per week and received partial short term disability benefits to compensate for the hours he was unable to work. Finally, immediately prior to ceasing active em-

---

6. While the record is not entirely clear as to the source or the duration of Toomey's short term disability benefits, it appears that F.W. Webb self-funded these payments. Although these benefits were supposed to last only six months, it appears that F.W. Webb agreed to extend payment of partial benefits beyond this six month deadline in order to accommodate Toomey's gradual return to work.

ployment with F.W. Webb, Toomey worked thirty hours a week for approximately ten weeks between May 1, 2001 and July 23, 2001.

### 4. Plaintiff's Claim for Benefits

Toomey's initial claim for benefits was denied. In a denial letter dated October 1, 2001, Unum explained that Toomey had not met the elimination period requirement. Specifically, Unum maintained that Toomey's elimination period extended from May 23, 2000 through November 18, 2000 and that to be eligible for long term disability benefits Toomey would have had to be out of work for this entire period. Unum informed Toomey that because he had returned to work on October 17, 2000 "[t]he number of continuous days that you were disabled is less than your elimination period. Since your disability did not exceed the elimination period, no benefits are payable on this claim." (UACL 009.) Alternatively, Unum's letter also suggested that its review of Toomey's medical records did not provide any support for finding that a disability, as defined under the Policy, prevented Toomey from working as of July 23, 2001.

With the assistance of an attorney, Jon Holder, Toomey appealed this initial denial of benefits. In a letter dated December 19, 2001, Unum informed Mr. Holder that Toomey's file was being returned to the field office for further investigation. In a letter dated January 24, 2002, Unum asked Mr. Holder to obtain copies of all of Dr. Black's treatment notes as well as any additional records from Dr. Rogers. In response to this request, Mr. Holder sent Unum Dr. Black's treatment notes. The records Mr. Holder submitted did not provide any evidence that Dr. Black had seen Toomey any time after March 18, 2001.

Unum had Dr. Neuren, a physician, review all of the medical records provided in connection with its further investigation of Toomey's claim. In a written report dated January 29, 2002, Dr. Nueren concluded that "[t]here is nothing in the records that would indicate that there had been a deterioration in [Toomey's] condition that would have caused him to be unable to work. . . . The limited information provided is inadequate to alter the prior opinion." (UACL 184–185.) Dr. Nueren was later asked to opine on any driving restrictions that might prevent Toomey from operating a forklift after having had a seizure, Dr. Neuren concluded that Toomey could have operated a forklift after six months of being seizure free. (UACL 253–54.) Unum also had Dr. Voss, a psychiatrist, review Toomey's medical records. In a report dated April 14, 2002, Dr. Voss concluded that Toomey did not have a psychiatric disorder that prevented him from working noting that his symptoms were "mild to moderate" and "responsive to treatment." (UACL 246.) Based on a review of the paper file, Dr. Voss also concluded that "[w]ork conflicts also appear to have been a significant factor in [Toomey's] failure to continue at F.W. Webb." (UACL 246.)

In a letter dated February 13, 2002, Unum informed Toomey's attorney that although it had reviewed additional information, it did not find that information "sufficient to reverse our previous decision." (UACL 220.) In a final five page letter dated May 17, 2002, Unum laid out in detail the evidence it had reviewed. The letter explained two alternative bases for Unum's decision to deny Toomey benefits: (1) "[A]pproximately 5 months after [his] surgery, he returned to work on a part-time basis. This would appear to be an extend [sic] recovery period, however, he was still able to return to work prior to the completion of his elimination period;" (2) "Our review of the medical records available to us do not reflect any change or

worsening of his condition as of 7/23/01 to support a loss of functional capacity to the level that Mr. Toomey is precluded from performing the material duties of his medium occupation from either a physical or psychological condition." [7] (UACL 262.)

## B. Standard of Review

 The procedural posture of this case is strikingly similar to that of *Curtin v. Unum Life Ins. Co.*, 298 F.Supp.2d 149 (D.Me.2004), another ERISA case recently decided by this Court. As explained in *Curtin,*

> Following *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the denial of benefits by an administrator of a plan covered by ERISA is reviewed by courts using an "arbitrary and capricious" standard only if the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. If the terms of the plan do not give the administrator or fiduciary discretionary authority to determine eligibility or construe the terms of the plan, judicial review proceeds under a *de novo* standard. *See id.* at 115, 109 S.Ct. 948.

*Curtin,* 298 F.Supp.2d at 152–53.

As in *Curtin,* the parties here "are in agreement that the terms of the plan in question do not afford the administrator the discretionary authority necessary to avoid *de novo* review by this Court. Thus, the question before this Court is whether the decision to deny [Plaintiff]'s claim was correct." *Curtin,* 298 F.Supp.2d at 153

(citing *Perry v. Simplicity Engineering,* 900 F.2d 963 (6th Cir.1990)). The Court answers this question by reviewing the administrative record keeping in mind that Plaintiff bears the burden of proving that he was entitled to disability benefits pursuant to the terms of the Policy.

## C. Discussion

 This case presents a sympathetic story of a man who has faced a serious medical challenge. Indeed, there is little doubt on the record provided that for various periods of time between May 2000 and September 2001, Walter Toomey could be fairly described as "disabled," as that term is generally used. However, the Policy at issue in this case provides particular definitions of "disability" as well as duration requirements that must be met for an insured to be entitled to long term disability benefits. Based on a *de novo* review of the administrative record, the Court concludes that Toomey did not satisfy these contractual requirements and, therefore, is not entitled to benefits under the terms of the Policy.

To determine Toomey's eligibility for benefits under the Policy, the first step is determining the date on which Toomey's injury or sickness first prevented him from doing the material duties of his occupation. On the facts presented, there are essentially two possible start dates for Toomey's disability: May 23, 2000 (the day after Toomey's seizure) or July 24, 2001 (the day after Toomey's final day of work at F.W. Webb). Below the Court considers whether Toomey is able to satisfy the elimination period using either of these dates to start

---

7. On appeal, Unum classified Toomey's occupation as involving "medium work" capacity. (UACL 175.) Prior to his absence that began on May 23, 2000, Toomey worked as a warehouse attendant. Based on a description provided by F.W. Webb, this warehouse attendant position involved standing, walking and sitting on an alternating basis as well as driving equipment, pushing and pulling 20 pound items and occasionally lifting up to 40 pounds. According to Toomey's supervisor, this position could be and was modified to accommodate Toomey. (UACL 72–74.)

the clock for the required 180 day elimination period.

### 1. The May 23, 2000 Start Date

As Unum explained in its May 17, 2002 letter upholding the denial of Toomey's benefits, the initial elimination period after Toomey's seizure extended from May 23, 2000 through November 18, 2000. On the record, there is no dispute that Toomey was out of work due to his disability from May 23, 2000 through October 17, 2000; thus satisfying 148 days of the elimination period. The dispute in this case centers around whether Toomey ever satisfied the remaining 32 days of the elimination period, thereby raising the possibility that he was eligible to collect benefits under the Policy.

Between October 18, 2000 and end of November 2000, Toomey worked only two days a week for a total of eight to ten hours per week. He continued to receive supplemental short term disability benefits for the hours he was unable to work. Unum appears to suggest that this very limited work schedule meant that as of October 18, 2000, Toomey was no longer disabled under the provisions of the Policy and thus, never satisfied the elimination period requirement of 180 days of continuous disability.

In fact, pursuant to the definition of elimination period, Toomey did not automatically stop the elimination period clock by working only two days a week. Rather, the Policy specifically allows for the elimination period to continue to run even if "disability stops ... for any 14 days or less." (UACL 326.) While the administrative record does not include a precise calendar of the days Toomey worked, by working only two days a week, Toomey arguably kept his elimination period clock running until he has worked more than 14 days.[8] By working at a rate of two days per week, one could reasonably estimate that Toomey subsequently satisfied the elimination period some time in December 2000.

However, Toomey never made a claim for benefits in or around the time that he arguably satisfied this initial elimination period. Rather, he continued to work and slowly increased his hours. By not making a claim for benefits at the time he satisfied the elimination period, the 180 days of disability Toomey arguably experienced between May 23, 2000 and December 2000 were essentially lost for purposes of his eligibility for long term disability benefits.

This conclusion is mandated by the terms of the Policy which essentially require an insured to actually receive benefits following completion of the elimination period in order to prevent the insured from having to restart the elimination period clock. Absent some receipt of benefits following completion of the initial elimination period, Toomey was prevented from

---

8. Plaintiff's Motion for Summary Judgment argues for an even broader reading of the "14 day" provision suggesting that "[a]s long as there are not more than 14 consecutive days of a return to work the count of elimination days would continue." (Pl's. Mot. for Summ. J. at 2.) This is not a fair reading of the plain language of the Policy. Moreover, adopting Plaintiff's reading would mean that even an average employee who returned to work full time (i.e., 5 days per week, 8 hours each day) could continue to accumulate elimination pe- riod time simply by not working on the weekends. Both the plain language of the Policy and common sense suggest that an insured stops the elimination period clock after working more than 14 days, regardless of whether the days are consecutive or spread out over any number of weeks. Thus, by working more than 14 days before completion of the elimination period, the insured is essentially no longer "disabled" pursuant to the terms of the Policy.

later qualifying for benefits under the "recurrent disability" or "partial disability" provisions of the Policy. By comparison, if Toomey had applied for benefits in or around December 2000 and had been deemed disabled under the terms of the Policy, he then would have received benefits. By receiving benefits, even if Toomey had subsequently gone back to work, he would have preserved his elimination period and arguably opened the door for his later inability to work to be treated as a "partial disability" or a "recurring disability" under the terms of the Policy. In any event, pursuant to any reasonable reading of the Policy, by not filing a claim and returning to active employment for about ten weeks from May 2001 through July 2001,[9] Toomey lost the opportunity to count the time he spent out of work in 2000 towards a later claim for long term disability benefits.

### 2. The July 24, 2001 Start Date

■ There is one other possibility under which Toomey might satisfy the elimination period requirement and thereby be eligible to collect benefits under the terms of the Policy: one could argue that Toomey was entitled to re-start the elimination period clock on July 24, 2001, the day he stopped working at F.W. Webb. To satisfy the elimination period requirement using this later start day, Toomey would have needed to provide evidence that he was continuously disabled and unable to perform the material duties of his occupation from July 24, 2001 through January 20, 2002.

In denying Toomey's claim, Unum concluded that there was insufficient evidence to support a finding that Toomey was disabled as of July 24, 2001. Rather, Unum found no evidence that Toomey's condition had worsened or deteriorated since he began working 30 hours a week. Thus, Unum found no basis for restarting the elimination period clock. Even if this Court were to find upon *de novo* review that Toomey was, in fact, disabled pursuant to the terms of the Policy on July 24, 2001, Toomey still would have to prove he was continuously disabled from that date through January 20, 2002 in order to complete the elimination period and establish his eligibility for the payment of benefits. However, no reading of the administrative record would allow this Court to conclude that Toomey was disabled from July 24, 2001 through January 20, 2002. In fact, the record is completely devoid of any suggestion that Toomey was even under the care of a physician for this entire period.

The First Circuit has held that an ERISA plaintiff is not under "a continuing responsibility to update her former insurance company ... on her disability during the pendency of her internal appeals ... on the off chance that she might prevail in her lawsuit." *Cook*, 320 F.3d at 24–25. This holding means that a claimant wrongly denied benefits need not be proactive about providing updated medical information during the appeals process. However, it does not provide an excuse for the claimant who fails to provide requested information and otherwise respond to invitations to provide information that would support her claim for benefits.

In this case, *Cook*'s holding dictates that Toomey was not under a continuing responsibility to proactively provide updated information to Unum after he received his

9. The Court notes that absent this period of active employment involving at least 30 hours of work each week, Toomey might not even have been covered by the Policy on the date of his claim, because the Policy which by its terms only covers employees working 30 hours a week, "disabled" employees or employees "given leave of absence." (UACL 314.)

initial October 1, 2001 denial letter and certainly had no duty to update Unum on his condition after receipt of the May 17, 2002 letter denying his appeal. However, during Unum's period of "further investigation" that spanned from December 19, 2001 through February 13, 2002, Toomey, through counsel, was asked and invited to submit updated information to support his claim. Specifically, as part of the further investigation that was undertaken in response to Toomey's appeal, Unum sent Mr. Holder a letter dated January 24, 2002, specifically asking for "all of [Dr. Black's] treatment records" and any "additional records" from Dr. Rogers (noting that it had received only one treatment note from Dr. Rogers dated June 18, 2001).[10] (UACL 181–182.) Holder responded by sending treatment notes from Dr. Black but none of those treatment notes document an office visit by Toomey after March 18, 2001.[11] The last apparent recorded treatment of Toomey in Dr. Black's records is a follow up MRI in August 2001 that found no evidence of recurrence of meningioma. The most recent office visit documentation provided by Mr. Holder is Toomey's September 27, 2001 appointment with Dr. Rogers. Dr. Rogers' summary of that visit suggests that Toomey's mental condition had improved since the June 18, 2001 visit and does not offer evidence that Toomey was disabled.

Thus, based upon its *de novo* review of the administrative record, the Court concludes that Plaintiff did not satisfy the elimination period and, therefore, is not entitled to benefits under the terms of the Policy. On this basis, the Court finds that Unum's decision to deny Toomey benefits was correct.

### D. UnumProvident's Separate Request for Summary Judgment

In light of the Court's holding that Plaintiff is not entitled to benefits, judgment will be entered in favor of both Defendants in this case and the Court need not address Unum's separate argument that summary judgment should be entered on behalf of UnumProvident on the grounds that it did not control the administration of Plaintiff's plan.

### III. Conclusion

For the reasons explained above, the Court DENIES Defendants' Motion to Strike and Plaintiff's Motion for Summary Judgment. The Court GRANTS Defendants' Motion for Summary Judgment and hereby ORDERS the Clerk to enter a judgment in favor of Defendants.

SO ORDERED.

---

10. Notably, this letter from Unum followed a letter from Mr. Holder, Toomey's counsel, dated January 17, 2002, in which Mr. Holder advocates for finding that Toomey has completed another 180 day period of disability since leaving F.W. Webb. (UACL 179.) In light of the fact that Mr. Holder argued for a second elimination period, it is a bit bewildering that he did not see fit to present Unum with medical records to support the assertion that Toomey was disabled and under the care a physician from July 23, 2001 through January 20, 2002.

11. The administrative record also contains a letter from Dr. Black dated March 25, 2002. While this letter provides explanation and clarification of Dr. Black's opinion of Toomey's medical condition and the basis for that opinion, the letter does not document any recent office visits or other treatment of Toomey.